1   ALAN HARRIS (S.B. #146079)
    DAVID ZELENSKI (S.B. #231768)
2   MATTHEW E. KAVANAUGH (S.B. #239961)
    HARRIS & RUBLE
3   5455 Wilshire Boulevard, Suite 1800
    Los Angeles, CA 90036
4   Telephone: (323) 931-3777
    Facsimile: (323) 931-3366
5
    Attorneys for Plaintiff
6   John D. Sarviss

7

8                   **UNITED STATES DISTRICT COURT**

9                   **CENTRAL DISTRICT OF CALIFORNIA**

10

11  JOHN D. SARVISS, individually        Case No. CV08-1484 DDP (CWx)
    and on behalf of all others similarly
12  situated,                            **PLAINTIFF'S STATEMENT OF
                                         GENUINE ISSUES IN OPPOSITION
13                  Plaintiff,           TO DEFENSE STATEMENT OF
                                         UNCONTROVERTED FACTS AND
14      v.                               CONCLUSIONS OF LAW**

15  GENERAL DYNAMICS                     Hearing Date:  June 15, 2009
    INFORMATION TECHNOLOGY,              Time:          10 a.m.
16  INC., and DOE ONE through and        Location:      Courtroom 3
    including DOE TEN                    Judge:         Judge Dean D. Pregerson
17
                    Defendants.
18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5

In accordance with Rule 56 of the Federal Rules of Civil Procedure, Plaintiff respectfully submits his Statement of Genuine Issues in Opposition to Defendant General Dynamics Information Technology ("GDIT" or "Defendant").

| MOVING PARTY'S ALLEGED UNCONTROVERTED FACTS | RESPONSE TO OPPOSITION |
|---|---|
| 1.    Defendant GDIT provides information technology solutions and services to military, government and commercial customers within the United States and around the world, including some of the United States' highest-priority defense and homeland security projects.  (Declaration of Kevin L. Thompkins ("Thompkins Decl."), ¶ 4.) | 1.    Plaintiff agrees this is undisputed for purposes of the defense Motion for Summary Judgment. |
| 2.    As part of a contract with the United States Army's Security Assistance Training Management Organization (SATMO), GDIT deployed a team, including Plaintiff John Sarviss ("Sarviss"), to the Islamic Republic of Pakistan to train Pakistani Air Force helicopter pilots in military night flight operations.  The training primarily | 2.  Plaintiff denies this is undisputed. Opposing party's evidence:  See Sarviss Declaration, ¶ ¶ 3, 17.[1]  Indeed, although Plaintiff initially understood that his job was to train "Pakistani helicopter pilots in night vision combat tactics," (Sarviss Dep. 51:10-11), in fact, most of the actual training was done on the ground, by another GDIT employee, John |

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

[1] Relevant portions of the Sarviss Deposition are attached as Exhibit 1 to the Saviss Declaration, filed herewith.

[PROPOSED] STMT OF UNCONTROVERTED
FACTS & CONCLUSIONS OF LAW
CV08-1484 DDP (CWX)

revolved around teaching the Pakistani Air Force pilots to fly military helicopters at night using light-gathering devices known as Night Vision Goggles ("NVGs"). (Thompkins Decl., ¶¶ 5-6; Deposition of John Sarviss ("Sarviss Depo.") 51:8-12.)

Landis.  Plaintiff's role was merely to take over the helicopter as pilot in the event of a problem, serving as a co-pilot or crewmember while an experienced Pakistani helicopter pilot had control of the craft, practicing flying with night vision goggles.  Most of the time, Plaintiff was a crewmember and a Pakistani was the pilot.  "My primary job in Pakistan was to keep myself and my co-pilot alive because of their lack of knowledge on how to operate an aircraft at night."  Sarviss Dep., 128:1-8.  While deployed by GDIT in Pakistan, Sarviss worked with experienced Pakistani helicopter pilots.  Sarviss did not teach them how to fly helicopters.  Before he left for Pakistan, Sarviss was advised by GDIT that each of these Pakistani helicopter pilots had at least 2000 hours of helicopter flight experience.  Sarviss described this in his deposition.  Sarviss Dep., 56:16-25.  Although he later learned that this was not true, each of the Pakistanis knew how to fly a helicopter before Sarviss met them.  John Landis of GDIT was responsible for training the

[PROPOSED] STMT OF UNCONTROVERTED
FACTS & CONCLUSIONS OF LAW
CV08-1484 DDP (CWX)

| | |
|---|---|
| | Pakistani helicopter pilots on basic night vision flying techniques. Each of the Pakistani helicopter pilots was provided with written materials to study and each was required to attend ground classroom sessions regarding night vision flying techniques. Sarviss Dep., 132:9-134:14; 157:11-25. During his work in Pakistan, Sarviss acted as a co-pilot or crewmember for the experienced Pakistani helicopter pilot, ready to take the controls, if necessary. Sarviss Dep., 158:12-160:1. This is routine work for individuals who are experienced in helicopters, routine manual work for which those in the industry ordinarily are paid overtime wages. |
| 2.    In late April 2007 or early May 2007, Sarviss saw and responded to a GDIT job posting on the internet for "qualified AH-1F and UH-1H/Bell 412 helicopter pilots to support [GDIT's] aviation requirements in pakistan [sic]." (Sarviss Depo. 42:9-43:20 & Exhibit ("Ex.") 3.) AH-1F and UH-1H/Bell 412 are models of helicopters used for | 3.    Plaintiff agrees this is undisputed for purposes of the defense Motion for Summary Judgment. |

| | |
|---|---|
| military and defense purposes. (Thompkins Decl. ¶ 5.) | |
| 4. The job posting required candidates to "be recognized as an Army Master Aviator and be qualified as either an SIP [Standardization Instructor Pilot] or IP [Instructor Pilot] with in-depth experience in using NVGs." (Sarviss Depo. 44:8-45:1 & Ex. 3.) | 4. Plaintiff agrees this is undisputed for purposes of the defense Motion for Summary Judgment. |
| 5. An "Army Master Aviator" must have 2,000 flight hours. (Sarviss Depo. 44:8-16.) | 5. Plaintiff agrees this is undisputed for purposes of the defense Motion for Summary Judgment. |
| 6. The terms "SIP" and "IP" are acronyms for Standardization Instructor Pilot and Instructor Pilot, respectively. In addition to being a pilot instructor, an SIP typically ensures that flight standards are consistent for all of the IPs. (Sarviss Depo. 44:22-45:11.) | 6. Plaintiff agrees this is undisputed for purposes of the defense Motion for Summary Judgment. |
| 7. Sarviss had approximately eight times the flight hours required to be considered an Army Master Aviator, and his background and training included coursework to become an SIP and training and experience working with NVGs. (Sarviss Depo. 10:12-11:7; 14:4-23; 24:8-26:13; 39:6-11; 39:24- | 7. Plaintiff agrees this is undisputed for purposes of the defense Motion for Summary Judgment. |

| 40:25; 45:17-19 & Ex. 1.) | |
|---|---|
| 8.    Sarviss had flown helicopters, including AH-1F and UH-1H/Bell412 helicopters, for more than 16,00 hours, and had approximately 4,700 hours flying at night and 260 hours of flying with NVGs.  (Sarviss Depo. 24:8-26:13; 43:17-44:5 & Ex. 1.) | 8.  Plaintiff agrees this is undisputed for purposes of the defense Motion for Summary Judgment. |
| 9.    On or about May 14, 2007, GDIT hired Sarviss to work on the team of NVG helicopter pilot trainers in Pakistan.  (Sarviss Depo. 59:17-60:16; Thompkins Decl., ¶ 6.) | 9.  Plaintiff agrees this is undisputed for purposes of the defense Motion for Summary Judgment. |
| 10.    GDIT hired Sarviss because he met the highly technical and specialized requirements of the position and his ability to train helicopter pilots as an SIP.  (Thompkins Decl., ¶ 6.) | 10.  Plaintiff denies this is undisputed. Opposing party's evidence:  See Sarviss Declaration, ¶¶ 3, 17.  Indeed, although Plaintiff initially understood that his job was to train "Pakistani helicopter pilots in night vision combat tactics," (Sarviss Dep. 51:10-11), in fact, most of the actual training was done on the ground, by another GDIT employee, John Landis.  Plaintiff's role was merely to take over the helicopter as pilot in the event of a problem, serving as a co-pilot or crewmember while an experienced Pakistani helicopter pilot had control of |

| | |
|---|---|
| | the craft, practicing flying with night vision goggles. Most of the time, Plaintiff was a crewmember and a Pakistani was the pilot. "My primary job in Pakistan was to keep myself and my co-pilot alive because of their lack of knowledge on how to operate an aircraft at night." Sarviss Dep., 128:1-8. Pursuant to Rule 602 of the Federal Rules of Evidence, Plaintiff objects to the Thompkins Declaration in connection with these "facts" for there is no foundation that his evidence in this regard is from personal knowledge. Pursuant to Rule 802 of the Federal Rules of Evidence, the evidence should be excluded as hearsay. |
| 11.    Sarviss' GDIT job title was "Operations Analyst V," an exempt salaried position at GDIT, and he did not hold any other positions with GDIT. (Sarviss Depo. 126:19-127:9; 134:15-16; Thompkins Decl. ¶ 6.) | 11. Plaintiff denies this is undisputed. Opposing party's evidence: See Sarviss Declaration, ¶ 5. After GDIT gave Sarviss the amorphous title "Operations Analyst V" he told Thompkins, prior to his deployment to Pakistan, that he "never analyzed any operations in [my] life, nor did [I] feel [I was] qualified to do it." Sarviss Dep., 126:19-127:14 at 127:12-14.  Thompkins told him "don't |

| | |
|---|---|
| | worry about it. It's just a job title." Id., 127:15-17. Plaintiff's concern was that "the original solicitation that we got that was on the Internet was looking for helicopter pilots. And we didn't know when our job went from manual labor to driving a desk." Id. 127:15:21. While in Pakistan, "I didn't analyze anybody's operation." Id. 127:22-25. The assertion that GDIT claims that all persons with this title are exempt is irrelevant and should be excluded under Rule 402 of the Federal Rules of Evidence. Pursuant to Rule 602 of the Federal Rules of Evidence, Plaintiff objects to the Thompkins Declaration in connection with these "facts" for there is no foundation that his evidence in this regard is from personal knowledge. |
| 12.    Although Sarviss was a California resident, GDIT did not hire him to provide any services in California. (Thompkins Decl., ¶ 6.) | 12. Plaintiff denies this is undisputed. Opposing party's evidence: See Sarviss Declaration, ¶¶ 12-13. While in California awaiting deployment to Pakistan, Plaintiff spoke with John Landis, the GDIT Team Leader for his work in Pakistan, several times. Sarviss |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Dep., 123:2-4. Landis told Sarviss that a number of the items that they were required to have were not available in Pakistan.  Landis told Sarviss that he should bring with him anything that he needed or that Plaintiff thought he might need.  They discussed the need for survival equipment, water purification equipment, and medical supplies. Landis told Sarviss he would likely become ill from exposure to the local food and water.  Landiss told Sarviss he would likely get diarrhea.  In fact, while in Pakistan Sarviss twice had dysentery. Sarviss Dep., 113:13-20.  Accordingly, Plaintiff went to his physician in Valencia, California, and secured a prescription for antibiotics and other drugs, and purchased those items at an Albertson's in California on June 6, 2007.  A copy of the Pharmacy receipt is attached as Exhibit 2 to the Sarviss Decl. The other drugs included medication for constipation and diarrhea.  During one or more of these June, 2007 discussions with Landis while Sarviss was in California, Landis told Sarviss that

[PROPOSED] STMT OF UNCONTROVERTED
FACTS & CONCLUSIONS OF LAW
CV08-1484 DDP (CWX)

| | |
|---|---|
| | GDIT had survival vests for him in Pakistan, but that they were empty. Accordingly, Plaintiff purchased a survival knife and other items for his survival vest, including bandages, signaling mirrors, flash lights, strobe lights, infrared lasers and, at a Sports Chalet in California, a water purifier. Sarviss Dep., 113:21-116:2; 119:18-125:10.  At the time of deployment to Pakistan, it was Plaintiff's understanding that there were no U.S. military bases in the country and that there was no readily available Pakistani source for the above items. |
| | In addition, while awaiting deployment from California, on or about June 1, 2007, Sarviss secured an International Driving Permit.  He understood that he was required to secure this permit as a condition of employment in Pakistan. Sarviss Dep., 150:12-13. |
| 13.    Immediately after being hired, from May 14 to 18, 2007, Sarviss attended the U.S. Army Security Assistance Team Training Orientation | 13.  Plaintiff agrees this is undisputed for purposes of the defense Motion for Summary Judgment. |

| | |
|---|---|
| Course ("SATTOC") at Fort Bragg, North Carolina. (Sarviss Depo. 80:15-81:8; 83:18-20; Thompkins Decl., ¶ 7.) | |
| 14.    GDIT's contract with the U.S. Government required Sarviss to complete this training before deploying to Pakistan. (Sarviss Depo. 81:22-82:7; Thompkins Decl., ¶ 7.) | 14.  Plaintiff agrees this is undisputed for purposes of the defense Motion for Summary Judgment. |
| 15.    The training sessions, which included other trainees deploying to countries all over the world, addressed topics related to Sarviss' mission, including an orientation about Pakistan, counter-surveillance, counter-terrorism procedures, weapons training and hostage survival. (Sarviss Depo. 81:9-13; 88:17-24.) | 15.  Plaintiff agrees this is undisputed for purposes of the defense Motion for Summary Judgment. |
| 16.    Sarviss was accompanied at SATTOC training by another GDIT trainee who was a resident of Pennsylvania. (Thompkins Decl. ¶ 7.) | 16.  Pursuant to Rule 602 of the Federal Rules of Evidence, Plaintiff objects to the Thompkins Declaration in connection with these "facts" for there is no foundation that his evidence in this regard is from personal knowledge. Pursuant to Rule 802 of the Federal Rules of Evidence, the evidence should be excluded as hearsay. |
| 17.    The SATTOC training lasted one | 17.  Plaintiff denies this is undisputed. |

| | |
|---|---|
| work week, for eight hours each day. (Sarviss Depo. 83:18-22.) | Opposing party's evidence:  See Sarviss Declaration, ¶8, 83:19-86:1. |
| 18.     Sarviss also alleges that he spent an additional 20 hours that week engaging in tasks to prepare for his deployment, including obtaining equipment at Pope Air Force Base, filling out additional paperwork, receiving the necessary vaccinations, and obtaining his passport, visa and contractor access card.  (Sarviss Depo. 83:23-84:16.) | 18.  Plaintiff agrees this is undisputed for purposes of the defense Motion for Summary Judgment. |
| 19.     In late May 2007, shortly after completing the SATTOC training at Fort Bragg, Sarviss attended a five-day flight safety course in the Dallas/Fort Worth, Texas area.  (Sarviss Depo. 103:4-10; 104:12-14.) | 19.  Plaintiff agrees this is undisputed for purposes of the defense Motion for Summary Judgment. |
| 20.     The course was provided by a third party and served as refresher training for flying the Bell 412 helicopter in which Sarviss would be training members of the Pakistani Air Force.  (Sarviss Depo. 104:9-11; Thompkins Decl.,   ¶ 8.)  This course was another condition of Sarviss' deployment to Pakistan.  (Thompkins | 20. Plaintiff agrees this is undisputed for purposes of the defense Motion for Summary Judgment. |

| | |
|---|---|
| Decl., ¶ 8.) | |
| 21.    Sarviss attended the training course from 8:00 a.m. to 5:00 p.m. each day, and was provided two 15-minute rest breaks and a 30-minute lunch break, for a total of eight hours per day. (Sarviss Depo. 105:7-106:7; 107:8-108:2.) | 21.  Pursuant to Rule 402 of the Federal Rules of Evidence, Plaintiff objects to these "facts" for there is no indication with respect to which training course reference is made.  The defense assertion is irrelevant. |
| 22.    Sarviss also alleges that he attended flight simulation exercises for another 1.5-2.5 hours at night.  (Sarviss Depo. 108:3-7.) | 22. Plaintiff agrees this is undisputed for purposes of the defense Motion for Summary Judgment. |
| 23.    After completing the training course in Texas, Sarviss returned to his home in California to await deployment to Pakistan.  (Id. 112:9-12.)  He was there for approximately two weeks. (Sarviss Depo. 113:21-24.) | 23.  Plaintiff agrees this is undisputed for purposes of the defense Motion for Summary Judgment. |
| 24.    On his own initiative, Sarviss spent time preparing for his deployment, which included packing his bags, conducting research on the Internet, and shopping for and purchasing supplies. GDIT did not ask him to perform any services during that time and that he did not purchase the supplies at GDIT's direction.  (Sarviss Depo. 113:25- | 24. Plaintiff denies this is undisputed. Opposing party's evidence:  See Sarviss Declaration, ¶¶12-13. These activities were not at Sarviss own initiative, but rather, they were a direct result of his communications with GDIT. While in California awaiting deployment to Pakistan, Plaintiff spoke with John Landis, the GDIT Team Leader for his |

| | |
|---|---|
| 114:23; 115:7-21; 119:18-121:8; 122:4-123:12.) | work in Pakistan, several times. Sarviss Dep., 123:2-4. Landis told Sarviss that a number of the items that they were required to have were not available in Pakistan. Landis told Sarviss that he should bring with him anything that he needed or that Plaintiff thought he might need. They discussed the need for survival equipment, water purification equipment, and medical supplies. Landis told Sarviss he would likely become ill from exposure to the local food and water. Landis told Sarviss he would likely get diarrhea. In fact, while in Pakistan Sarviss twice had dysentery. Sarviss Dep., 113:13-20. Accordingly, Plaintiff went to his physician in Valencia, California, and secured a prescription for antibiotics and other drugs, and purchased those items at an Albertson's in California on June 6, 2007. A copy of the Pharmacy receipt is attached as Exhibit 2 to the Sarviss Decl. The other drugs included medication for constipation and diarrhea. During one or more of these June, 2007 discussions with Landis while Sarviss was in |

California, Landis told Sarviss that GDIT had survival vests for him in Pakistan, but that they were empty. Accordingly, Plaintiff purchased a survival knife and other items for his survival vest, including bandages, signaling mirrors, flash lights, strobe lights, infrared lasers and, at a Sports Chalet in California, a water purifier. Sarviss Dep., 113:21-116:2; 119:18-125:10. At the time of deployment to Pakistan, it was Plaintiff's understanding that there were no U.S. military bases in the country and that there was no readily available Pakistani source for the above items.

In addition, while awaiting deployment from California, on or about June 1, 2007, Sarviss secured an International Driving Permit. He understood that he was required to secure this permit as a condition of employment in Pakistan. Sarviss Dep., 150:12-13. Sarviss reasonably interpreted his assignment to require that he Sarviss spend time in California preparing for his deployment, which included shopping for and

| | |
|---|---|
| | purchasing supplies.  Based on a realistic interpretation of the employment contract and Plaintiff's communications with Landis, GDIT asked him to perform these services during that time. |
| 25.    Sarviss does not claim that he was denied any meal or rest periods during the time he spent in California.  (Sarviss Depo. 115:22-116:8.) | 25. Plaintiff agrees this is undisputed for purposes of the defense Motion for Summary Judgment. |
| 26.    GDIT did not ask him to work more than eight hours per day or 40 hours per week while he awaited deployment at home in California. (Sarviss Depo. 119:11-15.) | 26. Plaintiff agrees this is undisputed for purposes of the defense Motion for Summary Judgment. |
| 27.    During the first week of June 2007, Sarviss deployed to Pakistan, where he worked alongside GDIT pilots from other states, including Pennsylvania, Georgia, Alabama, New Jersey, Nevada, Kentucky, Florida and North Carolina.  (Sarviss Depo. 125:15-19; 138:1-23; Thompkins Decl., ¶ 9.) | 27. Pursuant to Rule 602 of the Federal Rules of Evidence, Plaintiff objects to the Thompkins Declaration in connection with these "facts" for there is no foundation that his evidence in this regard is from personal knowledge. Pursuant to Rule 802 of the Federal Rules of Evidence, the evidence should be excluded as hearsay |
| 28.    Sarviss' primary duty was to train Pakistani Air Force helicopter pilots to | 28. Plaintiff denies this is undisputed. Opposing party's evidence:  See Sarviss |

| | | |
|---|---|---|
| 1 | conduct night flight operations using | Declaration, ¶¶ 3, 17. Indeed, although |
| 2 | NVGs. (Sarviss Depo. 51:8-12; | Plaintiff initially understood that his job |
| 3 | Thompkins Decl., ¶¶ 5-6.) | was to train "Pakistani helicopter pilots |
| 4 | | in night vision combat tactics," (Sarviss |
| 5 | | Dep. 51:10-11), in fact, most of the |
| 6 | | actual training was done on the ground, |
| 7 | | by another GDIT employee, John |
| 8 | | Landis. Plaintiff's role was merely to |
| 9 | | take over the helicopter as pilot in the |
| 10 | | event of a problem, serving as a co-pilot |
| 11 | | or crewmember while an experienced |
| 12 | | Pakistani helicopter pilot had control of |
| 13 | | the craft, practicing flying with night |
| 14 | | vision goggles. Most of the time, |
| 15 | | Plaintiff was a crewmember and a |
| 16 | | Pakistani was the pilot. "My primary |
| 17 | | job in Pakistan was to keep myself and |
| 18 | | my co-pilot alive because of their lack of |
| 19 | | knowledge on how to operate an aircraft |
| 20 | | at night." Sarviss Dep., 128:1-8. |
| 21 | | Pursuant to Rule 602 of the Federal |
| 22 | | Rules of Evidence, Plaintiff objects to |
| 23 | | the Thompkins Declaration in |
| 24 | | connection with these "facts" for there is |
| 25 | | no foundation that his evidence in this |
| 26 | | regard is from personal knowledge. |
| 27 | | Pursuant to Rule 802 of the Federal |
| 28 | | |

| | |
|---|---|
| | Rules of Evidence, the evidence should be excluded as hearsay. |
| 29.    While working in Pakistan, Sarviss was assigned to teach a different student each night, and each trainee had differing levels of experience, skills and knowledge.  (Sarviss Depo. 157:11-158:10.) | 29.  Plaintiff denies this is undisputed.  Opposing party's evidence:  See Sarviss Declaration, ¶¶ 3, 17.  Indeed, although Plaintiff initially understood that his job was to train "Pakistani helicopter pilots in night vision combat tactics," (Sarviss Dep. 51:10-11), in fact, most of the actual training was done on the ground, by another GDIT employee, John Landis.  Plaintiff's role was merely to take over the helicopter as pilot in the event of a problem, serving as a co-pilot or crewmember while an experienced Pakistani helicopter pilot had control of the craft, practicing flying with night vision goggles.  Most of the time, Plaintiff was a crewmember and a Pakistani was the pilot.   "My primary job in Pakistan was to keep myself and my co-pilot alive because of their lack of knowledge on how to operate an aircraft at night."  Sarviss Dep., 128:1-8. |
| 30.    During each flight with each student, Sarviss evaluated the trainee's skill level, determined what the trainee | 30. Plaintiff denies this is undisputed.  Opposing party's evidence:  See Sarviss Declaration, ¶¶ 3, 17.  Indeed, although |

could and could not do, and adjusted the mission profile based on what happened during the flight, including continuing the flight training (or terminating it) based on Sarviss' independent discretion and judgment. (Sarviss Depo. 157:11-158:16; 158:22-163:5; 185:8-24.)

Plaintiff initially understood that his job was to train "Pakistani helicopter pilots in night vision combat tactics," (Sarviss Dep. 51:10-11), in fact, most of the actual training was done on the ground, by another GDIT employee, John Landis. Plaintiff's role was merely to take over the helicopter as pilot in the event of a problem, serving as a co-pilot or crewmember while an experienced Pakistani helicopter pilot had control of the craft, practicing flying with night vision goggles. Most of the time, Plaintiff was a crewmember and a Pakistani was the pilot. "My primary job in Pakistan was to keep myself and my co-pilot alive because of their lack of knowledge on how to operate an aircraft at night." Sarviss Dep., 128:1-8. The defense omits reference to Sarviss' testimony that "[w]e had a limited amount of time to work with them and a limited amount of moon cycles." Id., 158:19-21. Plaintiff's objection to the question at 157:14-15 should be sustained.

31.    During a training flight, Sarviss

31. Plaintiff agrees this is undisputed for

| | |
|---|---|
| typically would put NVGs on the trainee and give him the controls to the helicopter.  (Sarviss Depo. 158:12-160:1.)  Sarviss constantly monitored the helicopter's instruments, and took the controls away from the pilot if necessary.  Sarviss also checked to ensure that the pilot trainee was interpreting the terrain correctly through the NVG.  (Sarviss Depo. 158:12-160:1; 185:25-186:15.) | purposes of the defense Motion for Summary Judgment. |
| 32.     While in Pakistan, Sarviss, on his own initiative, instituted a rule that the pilot needed to return the helicopter with 700 pounds of fuel remaining, and he would adjust mission profiles accordingly.  (Sarviss Depo. 158:12-160:1; 185:25-186:15.)  *Sarviss* couched his rule in terms of life and death:  "And that wasn't a rule of the Pakistan [sic].  That was something I instituted, because they had some people that got killed just before I got over there.  And I wasn't going to stand for any more of that nonsense because they weren't qualified to be flying the aircraft and they got caught in a sand storm and they | 32. Pursuant to Rule 402 of the Federal Rules of Evidence, Plaintiff objects to these "facts" for there is no indication with respect to what sort of "rule" was involved.  Was this "rule" adopted by the Pakistani military or what this pure hyperbole or only applied when Sarviss was flying.  The defense assertion is irrelevant. |

| | |
|---|---|
| got dead…. And I didn't want to see anybody dead over there any more than needed to be. So that's what I did." (Sarviss Depo. 184:25-185:7.) | |
| 33. Sarviss also prepared instrument approaches for "divert" fields; located a survival escape and evasion area, and created and put into place a plan; and conducted approximately 10 "captain check rides," during which he would evaluate and certify a trainee as an aircraft commander. (Sarviss Depo. 165:20-166:9, 199:22-200:6; 200:12-16.) | 33. Pursuant to Rule 402 of the Federal Rules of Evidence, Plaintiff objects to these "facts" for there is no indication with respect to the significance of these matters. The defense assertion is irrelevant. |
| 34. Sarviss believed that the purported team leader, GDIT employee John Landis, was not qualified to be an instructor pilot because he had failed a "check ride" with the Pakistani Base Commander, Lieutenant Colonel Shahid. (Sarviss Depo. 133:14-134:14; 161:16-163:22.) Sarviss "could not rely on Landis" or the Base Commander because Landis "was not qualified to carry [Sarviss'] helmet bag," and the Commander "wasn't qualified to fly the aircraft or fly with [NVGs]." (Sarviss | 34. Plaintiff denies this is undisputed. Opposing party's evidence: See Sarviss Declaration, ¶18. Sarviss testified that he was "n[o]t put . . . in charge of GDIT" in Multan. Sarviss Dep., 163:2-13. A new Pakistani commander was assigned to the base in Multan and, at his request and as "a favor that was asked by the Pakistani commander" Sarviss assisted him in evaluating some of the Pakistani helicopter pilots. Id. 165:20-166:9. The Pakistani commander "asked Landis to |

Depo. 162:20-163:5, 164:4-165:10.) Because of this lack of qualifications, Sarviss claims the Pakistani Air Force made *him* the SIP for the entire squadron. (Sarviss Depo. 162:20-163:5.)

ask me if I would do it." Id., 166:10-13. This activity was beyond the scope of Plaintiff's assignment and beyond the scope of what GDIT was to do in Multan, but Sarviss agreed to help as a favor. The activity was entirely incidental to Plaintiff's job, and took relatively little time. Indeed, the defense misquotes the testimony, in which Sarviss was speaking of the SIP for the 25th Squadron, not for GDIT. Sarviss Depo. 162:20-163:5, at 163:3-4. Pursuant to Rule 402 of the Federal Rules of Evidence, Plaintiff objects to these "facts" for the fact that an employee thinks his superior is incompetent plays no role in determining the employee's status as exempt or non-exempt. The defense assertion is irrelevant.

35.    Sarviss also wrote to one of GDIT's competitors, Camber, that "[GDIT] didn't pull [the Pakistan mission] off. We did." By that, Sarviss meant himself and his colleague, Ken Lazorchak. (Sarviss Depo. 227:14-228:25, Ex. 13.)

35. Plaintiff agrees this is undisputed for purposes of the defense Motion for Summary Judgment. Pursuant to Rule 402 of the Federal Rules of Evidence, Plaintiff objects to these "facts" for there is no indication with respect to the significance of these matters. The

| | |
|---|---|
| | defense assertion is irrelevant. |
| 36.    Sarviss was required to rely extensively upon his 30-plus years of military and civilian experience and training to conduct NVG flight training. (Sarviss Depo. 130:6-17; 131:8-132:8.) Sarviss testified that he routinely made "life or death" decisions.  (Sarviss Depo. 128:1-130:17; 184:25-185:7.) | 36. Plaintiff denies this is undisputed. Opposing party's evidence:  See Sarviss Declaration, ¶ ¶ 3, 17.  Indeed, although Plaintiff initially understood that his job was to train "Pakistani helicopter pilots in night vision combat tactics," (Sarviss Dep. 51:10-11), in fact, most of the actual training was done on the ground, by another GDIT employee, John Landis.  Plaintiff's role was merely to take over the helicopter as pilot in the event of a problem, serving as a co-pilot or crewmember while an experienced Pakistani helicopter pilot had control of the craft, practicing flying with night vision goggles.  Most of the time, Plaintiff was a crewmember and a Pakistani was the pilot.   "My primary job in Pakistan was to keep myself and my co-pilot alive because of their lack of knowledge on how to operate an aircraft at night."  Sarviss Dep., 128:1-8.  While deployed by GDIT in Pakistan, Sarviss worked with experienced Pakistani helicopter pilots.  Sarviss did not teach them how to fly helicopters.  Before he |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

left for Pakistan, Sarviss was advised by GDIT that each of these Pakistani helicopter pilots had at least 2000 hours of helicopter flight experience. Sarviss described this in his deposition. Sarviss Dep., 56:16-25. Although he later learned that this was not true, each of the Pakistanis knew how to fly a helicopter before Sarviss met them. John Landis of GDIT was responsible for training the Pakistani helicopter pilots on basic night vision flying techniques. Each of the Pakistani helicopter pilots was provided with written materials to study and each was required to attend ground classroom sessions regarding night vision flying techniques. Sarviss Dep., 132:9-134:14; 157:11-25. During his work in Pakistan, Sarviss acted as a co-pilot or crewmember for the experienced Pakistani helicopter pilot, ready to take the controls, if necessary. Sarviss Dep., 158:12-160:1. This is routine work for individuals who are experienced in helicopters, routine manual work for which those in the industry ordinarily are paid overtime wages.

[PROPOSED] STMT OF UNCONTROVERTED
FACTS & CONCLUSIONS OF LAW
CV08-1484 DDP (CWX)

| | |
|---|---|
| 37.    On July 17, 2007, Sarviss tendered his resignation to GDIT.  On or about August 7, 2007, Sarviss submitted an amended resignation letter seeking to move his last date of employment to September 4, 2007.  (Sarviss Depo. 230:8-231:14; 233:20-235:10 & Exs. 14 & 15; Thompkins Decl., ¶ 10.) | 37.  Plaintiff agrees this is undisputed for purposes of the defense Motion for Summary Judgment. |
| 38.    Sarviss returned to the United States, and separated from employment with GDIT effective September 4, 2007. (Sarviss Depo. 144:16-23; 239:16-19; Thompkins Decl., ¶ 10.) | 38.  Plaintiff denies this is undisputed. Opposing party's evidence:  See Sarviss Declaration, ¶ 21. Plaintiff's final wage statement was dated October 18, 2007, long after he had been terminated. Thompkins Decl., Ex. B (JS-000001545).  His final regular paycheck was dated September 20, 2007, long after his last day of work, the date on which he was returned to California, on or about September 13, 2007.  Id. (JS-000001544).  According to documentation he received from GDIT entitled "Important Information for Employees Separating from GDIT Corporation":<br><br>Your last day worked is your termination date.  Any accrued, unused General |

| | |
|---|---|
| | Leave to which you may be entitled will automatically be included in your final check; conversely, where permitted by law, your final check will reflect deductions for any used but not accrued general leave. Your final paycheck will be paid as either a 'live' check or 'direct deposit' depending upon your payroll elections at time of payout.  Final paychecks will be issued on the next regularly scheduled pay date, unless otherwise required by state law. Exhibit 3 to Sarviss Decl. |
| 39.    During his four months of employment with Defendant, GDIT paid Sarviss more than $68,000.00 in compensation.  Specifically, GDIT paid Sarviss an annual salary of $83,200.00, paid biweekly at $3,200.00 per pay period.  (Sarviss Depo. 65:15-67:3; 67:15-68:4; 69:6-20; 140:14-141:13 & | 39.  Plaintiff agrees this is undisputed for purposes of the defense Motion for Summary Judgment.  Pursuant to Rule 402 of the Federal Rules of Evidence, Plaintiff objects to these "facts" for there is no indication with respect to the significance of these matters.  The defense assertion is irrelevant, apart |

| | |
|---|---|
| Ex. 6; Thompkins Decl., ¶ 11 & Ex. B.) GDIT paid Sarviss his base salary while he attended training in North Carolina and Texas, and also while he was at home in California waiting to deploy to Pakistan. (Sarviss Depo. 116:13-23; Thompkins Decl., ¶ 11.) | from the admission that Sarviss had an annual salary of only $83,200, far less than $100,000. |
| 40.    While working in Pakistan, in addition to his base salary, GDIT paid Sarviss an additional 25% of his base salary for "Danger Pay," plus an additional 20% "Hardship Differential." (Sarviss Depo. 65:15-67:3; 72:10-14 & Ex. 6; Thompkins Decl., ¶ 11 & Ex. B.) | 40.  Plaintiff denies this is undisputed. Opposing party's evidence:  this Court may take judicial notice of the fact that Plaintiff's Danger Pay and Hardship Differential were bonuses, computed on the assumption that he did not work any overtime and/or that he was not eligible for overtime. |
| 41.    GDIT also paid Sarviss a full $30,000.00 contractual "completion" bonus (Sarviss Depo. at 144:13-15 & Ex. 6). | 41.  Plaintiff agrees this is undisputed for purposes of the defense Motion for Summary Judgment.  Pursuant to Rule 402 of the Federal Rules of Evidence, Plaintiff objects to these "facts" for there is no indication with respect to the significance of these matters.  The defense assertion is irrelevant, apart from the admission that Sarviss had an annual salary of only $83,200, far less than $100,000. |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **ADDITIONAL GENUINE ISSUES OF FACT**

(1) This Court may take judicial notice that the legal name of the Defendant is GENERAL DYNAMICS INFORMATION TECHNOLOGY, INC., rather than GENERAL DYNAMICS INFORMATION TECHNOLOGY.

(2) Sarviss worked for Defendant from in or about May 2007 through September 2007.  Sarviss learned of the possible work with Defendant from an internet solicitation he received at his California home in or about April of 2007. The solicitation is attached to the Declaration of Michael Garrison in Support of Defendant General Dynamics Information Technology's Motion for Summary Judgment as Exhibit A (p. 170)("Garrison Decl.")  As reflected in his deposition, Sarviss understood that the solicitation "was seeking qualified helicopter pilots to support aviation requirements," rather than individuals to train others to fly helicopters, as indicated in the defense submission in support of their Motion for Summary Judgment.  Relevant portions of his deposition in this case are attached hereto as Exhibit 1.  See Sarviss Dep., 47:6-20, at 19-20.  Sarviss Decl., ¶2.

(3) Indeed, although Sarviss initially understood that his job was to train "Pakistani helicopter pilots in night vision combat tactics," (Sarviss Dep. 51:10-11), in fact, most of the actual training was done on the ground, by Mr. Landis.  His role was merely to take over the helicopter as pilot in the event of a problem, serving as a co-pilot or crewmember while an experienced Pakistani helicopter pilot had control of the craft, practicing flying with night vision goggles.  Most of the time, Sarviss was a crewmember and a Pakistani was the pilot.   "My primary job in Pakistan was to keep myself and my co-pilot alive because of their lack of knowledge on how to operate an aircraft at night."  Sarviss Dep., 128:1-8.  Sarviss Decl., ¶3.

(4) Sarviss was assigned to work in North Carolina, Texas and Pakistan as a

- 28 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

full time employee of General Dynamics Information Technology, Inc. ("GDIT").
His employment responsibilities focused on acting as a helicopter pilot, as and
when required.  A true and accurate copy of his job assignment offer from GDIT is
attached to the April 6, 2009, Declaration of Kevin L. Thompkins in Support of
Defendant General Dynamics Information Technology's Motion for Summary
Judgment as Exhibit A ("Thompkins Decl.").  Sarviss Decl., ¶4.

(5) Although GDIT gave Sarviss the amorphous title "Operations Analyst V"
Sarviss told Thompkins, prior to his deployment to Pakistan, that he "never
analyzed any operations in [my] life, nor did [I] feel [I was] qualified to do it."
Sarviss Dep., 126:19-127:14 at 127:12-14.  Thompkins told Sarviss: "don't worry
about it.  It's just a job title."  Id., 127:15-17.  Plaintiff's concern was that "the
original solicitation that we got that was on the Internet was looking for helicopter
pilots.  And we didn't know when our job went from manual labor to driving a
desk."  Id. 127:15:21.  While in Pakistan, "I didn't analyze anybody's operation."
Id. 127:22-25.  Sarviss Decl., ¶5.

(6) On May 11, 2007, Sarviss was provided a document entitled
"International Assignment Provisions."  That document, executed by Plaintiff on
May 14, 2007, states that "[t]his assignment is based on 40 hours per week."
Thompkins Decl., Exhibit A, Job Offer, (JS 000000999).  The "International
Assignment Provisions for John D. Sarviss" detail his California residence as the
"[l]ocation considered to be [his] US 'Tax' Home."  Id., at JS 000000999.  The
"International Assignment Provisions for John D. Sarviss" promises that his
transportation back to his home at the end of the assignment would be paid for, but
Sarviss has not been reimbursed for all of those expenses.  Id. ("Transportation
. . . [w]ill be provided").  Indeed, the Letter of Understanding to which the
"International Assignment Provisions for John D. Sarviss" is attached specifically
states that GDIT "will provide for return relocation to your point of origin . . . upon

termination of the international assignment." (Id., JS 000000997)  Finally, the "International Assignment Provisions for John D. Sarviss" asserts that GDIT "does not guarantee your employment for any specific period of time and . . . . GDIT may terminate your employment at any time, [f]or any reason, with or without notice." (Id., JS 000001001)  Sarviss Decl., ¶6.

(7) GDIT employees assured Plaintiff that his work would be limited to 40 hours per week.  Before deployment to Pakistan, Sarviss met with Kevin Thompkins at the Fayetteville, North Carolina, GDIT office.  Thompkins told Sarviss that he would not receive overtime for his GDIT work, as he would not be working more than 40 hours per week.  This matter was covered in his deposition. Sarviss Dep., 74:3-75:10.  Sarviss assumed that he would be paid overtime for hours in excess of eight per day or forty per week.  In every civilian job Sarviss has ever had working as a helicopter pilot or crewmember, he has received overtime pay.  A resume, listing some of his work experience with helicopters, is attached to the Garrison Decl., Exhibit A (p. 170).  When that overtime pay was not forthcoming from GDIT, Sarviss did not quit, since he felt his work was helping the war on terrorism, and he wanted to complete the assignment. Sarviss Decl., ¶7.

(8) In May and June of 2007, Sarviss was required to undertake extensive travel and work in the United States.  During that period, after Sarviss left from his residence in Leona Valley, California, working for GDIT, he frequently worked in excess of 8 hours per day and 40 hours per week.  In early June, 2007, Sarviss was deployed from Los Angeles International Airport to Pakistan.  During the several months Sarviss worked for GDIT in Pakistan, he frequently worked in excess of 8 hours per day and 40 hours per week.  In fact, there were many weeks that Sarviss was required to work in excess of 70 or even 80 hours in a week.  These efforts were described in his deposition of February 27, 2009, 18:1-19:5; 80:16-81:13; 82:11-16; 83:19-86:1; 103:4-17; 103:24-104:20; 104:25-105:23; 106:23-108:12;

108:24-25; 169:18-170:4; 173:14-174:13; 181:1-2; 216:23-218:15.  Sarviss Decl.,
¶8.

(9) Sarviss was never compensated for any overtime he worked.  From his
experience working for GDIT and interactions with other employees of GDIT,
Sarviss understood that his GDIT colleagues had a similar experience:  they were
advised the work would not exceed 8 hours per day and forty hours per week, but in
practice they all worked more than eight hour days, and more than forty hours per
week.  As articulated in his deposition, before Sarviss went to Pakistan, Sarviss
believed that California's overtime laws would apply to his work for GDIT, in
California or elsewhere, including Pakistan.  Sarviss Dep., 77:2-78:22.  Sarviss
Decl., ¶9.

(10) Throughout his employment by GDIT, Sarviss was routinely deprived of
rest periods and meal breaks.  Sarviss Dep., 87:22-89:16; 90:9-90:21; 91:3-91:19;
92:5-22; 178:9-12; 179:2-6; 186:16-187:11.  Sarviss Decl., ¶10.

(11) After his initial orientation and training in North Carolina and Texas, at
the direction of GDIT, Sarviss returned to his California home, awaiting
deployment.  Sarviss Dep., 112:9-113:20.  Sarviss Decl., ¶11.

(12) While in California awaiting deployment to Pakistan, Sarviss spoke with
John Landis, the GDIT Team Leader for his work in Pakistan, several times.
Sarviss Dep., 123:2-4. Landis called Sarviss in the middle of the night, due to the
time difference between Pakistan and California.  During their conversations,
Landis told Sarviss that a number of the items that they were required to have were
not available in Pakistan.  Landis told Sarviss that he should bring with him
anything that Sarviss needed or that Sarviss thought he might need.  They discussed
the need for survival equipment, water purification equipment, and medical
supplies.  Landiss told Sarviss that he would likely become ill from exposure to the
local food and water.  Landis told Sarviss that he would likely get diarrhea.  In fact,

while in Pakistan Sarviss twice had dysentery.  Sarviss Dep., 113:13-20.

Accordingly, Sarviss went to his physician in Valencia, California, and secured a

prescription for antibiotics and other drugs, and purchased those items at an

Albertson's in California on June 6, 2007.  A copy of the Pharmacy receipt is

attached as Exhibit 2.  The other drugs included medication for constipation and

diarrhea.  During one or more of these June, 2007 discussions with Landis while

Sarviss was in California, Landiss told Sarviss that GDIT had survival vests for him

in Pakistan, but that they were empty.  Accordingly, Sarviss purchased a survival

knife and other items for his survival vest, including bandages, signaling mirrors,

flash lights, strobe lights, infrared lasers and, at a Sports Chalet in California, a

water purifier.  Sarviss Dep., 113:21-116:2; 119:18-125:10.  At the time of his

deployment to Pakistan, it was Plaintiff's understanding that there were no U.S.

military bases in the country and that there was no readily available Pakistani

source for the above items.  Sarviss Decl., ¶12.

(13) In addition, while awaiting deployment from California, on or about

June 1, 2007, Sarviss secured an International Driving Permit.  Sarviss understood

that he was required to secure this permit as a condition of his employment in

Pakistan.  Sarviss Dep., 150:12-13.  Sarviss Decl., ¶13.

(14) On July 17, 2007, Sarviss sent GDIT a letter of resignation, noting that

"I still have not been reimbursed for expenses incurred on your behalf over 60 days

ago for over several thousand dollars."  Garrison Decl., Ex. A, p. 175.  Thereafter,

on August 7, 2007, Sarviss was promised that all of his concerns would be

addressed, and Sarviss amended the July 17, 2007, letter of resignation.  Id., p. 176;

Sarviss Dep., 211:19-212:17. To date, however, Sarviss has yet to be reimbursed

for all of his out of pocket expenses incurred on behalf of GDIT.  Some of the facts

relating to this were described in his deposition.  Sarviss Dep., 63:15-65:5; 94:12-

19; 94:25-95:12; 95:19-96:2, 5-12; 96:25-97:24; 98:20-99:4; 195:19-196:7; 196:17-

[PROPOSED] STMT OF UNCONTROVERTED
FACTS & CONCLUSIONS OF LAW
CV08-1484 DDP (CWX)

197:16; 198:8-12; 199:14-200:17; 200:24-201:6; 203:9-204:2; 236:13-238:1; 238:8-239:6. The reason for an amended resignation date had been discussed with responsible individuals at GDIT and was clearly articulated in the August 7, 2007, letter:

> This resignation runs concurrent with an offer letter from the winner of the Kazakhstan Huey II support contract and the early release will provide necessary allocated time for personal preparation prior to training and re-deployment in support of another SATMO mission and to address a legal commitment in South Carolina on September 6, 2007.

Garrison Decl., Ex. A, p. 176.  Sarviss Decl., ¶14

(15) During his GDIT work, Sarviss frequently was required to work in excess of 5 consecutive hours without being provided a meal or rest break.  Sarviss was not compensated for any missed meal or rest breaks. Once again, from his personal experience and interactions with other GDIT employees, it was not uncommon for GDIT employees to frequently work in excess of 5 hours without being provided a meal or rest break.  Sarviss Decl., ¶15.

(16) While deployed by GDIT in Pakistan, Sarviss was under armed-guard supervision at all times.  Sarviss was not allowed to leave his hotel room for any reason without armed-guard supervision.  In other words, Sarviss was always under full and complete control of GDIT, and could not engage in any personal activities. Sarviss Decl., ¶16.

(17) While deployed by GDIT in Pakistan, Sarviss worked with experienced Pakistani helicopter pilots.  Sarviss did not teach them how to fly helicopters. Before he left for Pakistan, Sarviss was advised by GDIT that each of these Pakistani helicopter pilots had at least 2000 hours of helicopter flight experience. Sarviss described this in his deposition.  Sarviss Dep., 56:16-25.  Although he later

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

learned that this was not true, each of the Pakistani's knew how to fly a helicopter before Sarviss met them.  John Landis of GDIT was responsible for training the Pakistani helicopter pilots on basic night vision flying techniques.  Each of the Pakistani helicopter pilots was provided with written materials to study and each was required to attend ground classroom sessions regarding Night Vision flying techniques.  Sarviss Dep., 132:9-134:14; 157:11-25.  During his work in Pakistan, Sarviss acted as a co-pilot or crewmember for the experienced Pakistani helicopter pilot, ready to take the controls, if necessary.  Sarviss Dep., 158:12-160:1.  This is routine work for individuals who are experienced in helicopters, routine manual work for which those in the industry ordinarily are paid overtime wages.  Sarviss Decl., ¶17.

(18) Despite the implications of the defense argument in its Motion for Summary Judgment, as articulated in his deposition, Sarviss was "n[o]t put . . . in charge of GDIT" in Multan.  Sarviss Dep., 163:2-13.  A new Pakistani commander was assigned to the base in Multan and, at his request and as "a favor that was asked by the Pakistani commander" Sarviss assisted him in evaluating some of the Pakistani helicopter pilots.  Id. 165:20-166:9.  The Pakistani commander "asked Landis to ask me if I would do it."  Id., 166:10-13.  This activity was beyond the scope of his assignment and beyond the scope of what GDIT was to do in Multan, but Sarviss agreed to help as a favor.  The activity was entirely incidental to his job, and took relatively little time.  Sarviss Decl., ¶18.

(19) Significantly, Sarviss knows of no training or certification that is required or available for one who is involved in training others to fly helicopters with night vision goggles.  This was covered in his deposition, at 39:12-23.  Indeed, as described in his deposition, learning how to fly with night vision goggles is nothing more than "[f]lying on night vision goggles, takeoffs, landing, night vision goggle failure, idiosyncratic things that come from wearing them, limited field of

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

view . . . It's kind of on-the-job training." Id. 39:24-40:12. Sarviss did not really instruct others in the use of night vision goggles as much as ride with the experienced Pakistani helicopter pilots so he would be available to take over control of the helicopter in the event that they had a problem. Their "training" consisted of the reading materials that Mr. Landis gave to them, his on the ground lectures, and their securing practical "on the job" experience while Sarviss sat next to them in the helicopter, ready to take the controls, if necessary. As stated in his deposition, learning how to fly with night vision goggles is a simple matter of practical experience. Id., 40:24-25. Sarviss Decl., ¶19.

(20) Attached as Exhibit B to the Thompkins Decl. are true and accurate copies of paystubs Sarviss received from GDIT. Although they reflect part of GDIT's name on the pay stub, it does not indicated whether it is in fact his employer, or if his employer is in fact Anteon Corp., which name is also listed on the pay stub, or whether Sarviss was an employee of General Dynamics Company, which name is also listed on the pay stub. The wage statement does not identify the legal name of his employer. In addition, the wage statements fail to list the correct total overtime hours Sarviss worked or provide detail regarding compensation for missed meal/rest breaks. The wage statements also fail to indicate the total hours worked or the applicable hourly rates in effect during the pay period. Sarviss found his wage statement to be quite confusing. Each wage statement was mailed to him at his Leona Valley, CA address, rather than provided to him in Pakistan, as Sarviss requested. Sarviss Dep., 69:8-23. Paula Coombs of GDIT HR told Sarviss that this was "a company-wide problem." Id., 70:14-19. Each reflects a deduction for California income tax. Each reflects deduction for California unemployment insurance premiums. Sarviss Decl., ¶20.

(21) His final wage statement was dated October 18, 2007, long after Sarviss had been terminated. Thompkins Decl., Ex. B (JS-000001545). His final regular

- 35 -

paycheck was dated September 20, 2007, long after his last day of work, the date on which Sarviss was returned to California, on or about September 13, 2007.  Id. (JS-000001544).  According to documentation Sarviss received from GDIT entitled "Important Information for Employees Separating from GDIT Corporation":

> Your last day worked is your termination date.  Any accrued, unused General Leave to which you may be entitled will automatically be included in your final check; conversely, where permitted by law, your final check will reflect deductions for any used but not accrued general leave.  Your final paycheck will be paid as either a 'live' check or 'direct deposit' depending upon your payroll elections at time of payout.  **Final paychecks will be issued on the next regularly scheduled pay date, unless otherwise required by state law.**

Exhibit 3 (emphasis in bold).  Sarviss Decl., ¶21.

(22)  The wage statements reflected in Exhibit B to the Thompkins Decl. clearly listed California as his "State of Residence." The wage statements indicated deductions for "CA Withholding" and "CA SDI FTDI" (Id.) GDIT recognized that California State Law would apply to his separation from GDIT (Exhibit 3).  Sarviss Decl., ¶22.

(23) There are tremendous differences between flying a helicopter and flying an airplane.  Sarviss is licensed to fly both helicopters and airplanes.  It is infinitely easier to fly an airplane than a helicopter.  Comparing the difficulty of flying a helicopter versus a flying a plane is like comparing driving a car to maneuvering a unicycle.  The two vehicles are operated differently and built differently.  Sarviss was reminded of a quote by the ABC New Reporter, Harry Reasoner.  Reasoner said:  "The thing is helicopters are different from airplanes. An airplane by it's nature wants to fly, and if not interfered with too strongly by unusual events or incompetent piloting, it will fly. A helicopter does not want to fly. It is maintained

in the air by a variety of forces and controls working in opposition to each other. And if there is any disturbance in this delicate balance the helicopter stops flying immediately and disastrously. There is no such thing as a gliding helicopter. That's why being a helicopter pilot is so different from being an airplane pilot, and why in generality airplane pilots are open, clear-eyed, buoyant, extroverts. And helicopter pilots are brooders, introspective anticipators of trouble. They know if something bad has not happened it is about to." http://www.searchk9.net/helitac/ harryreasoner.htm. A helicopter is a tender and delicate balancing act, not unlike juggling on a unicycle. Flying a helicopter such as the one Sarviss used in Pakistan requires constant manual effort. It is <u>routine</u> manual and physical work involving <u>repetitive</u> operations with the pilot's hands, physical skill and energy. Sarviss Decl., ¶23.

### <u>CONCLUSIONS OF LAW</u>

I.     <u>GDIT IS NOT ENTITLED TO SUMMARY JUDGMENT ON SARVISS' FLSA OVERTIME CLAIM.</u>

A. <u>The FLSA and Sarviss' Employment In Pakistan.</u>

| | |
|---|---|
| 1.     Sarviss cannot apply the FLSA to services he performed in a foreign country -- the Islamic Republic of Pakistan. The statutory language of the FLSA explicitly limits its reach to services provide within the borders of the United States and its territories. <u>See</u> 29 U.S.C. § 213(f). Specifically, Section 213(f) states: "The provisions of sections 206, 207 [regulating overtime], 211, and 212 of | 1. Sarviss is entitled to the protections of the FLSA for any pay period when all or a portion of his work was done within the United States. |

| | |
|---|---|
| this title shall not apply with respect to any employee <u>whose services during the workweek are performed in a workplace within a foreign country</u>...." <u>Id</u>. (Emphasis added.) | |
| 2.     Courts interpreting this provision have declined to extend its reach beyond its own words, particularly in light of the presumption against extraterritorial application of the laws of the United States.  <u>See</u>, <u>e.g.</u>, <u>Smith v. Raytheon Co.</u>, 297 F. Supp. 2d 399 (D.Mass. 2004) (holding that the FLSA did not apply to work performed in a foreign country and granting employer's motion to dismiss for failure to state a claim); <u>Pfeiffer v. Wm. Wrigley Jr. Co.</u>, 755 F.2d 554 (7th Cir. 1985) (affirming summary judgment for employer and declining to extend the Age Discrimination in Employment Act -- which incorporates Section 213(f) by reference -- to employment in Germany); 336 U.S. 281, 285, 69 S. Ct. 575, 577, 93 L. Ed. 680 (U.S. 1949) (ruling that "legislation of Congress, unless a contrary intent appears, is meant to apply only within | 2. Sarviss is entitled to the protections of the FLSA for any pay period when all or a portion of his work was done within the United States. |

| | |
|---|---|
| the territorial jurisdiction of the United States"). Instructive here, in <u>Pfieffer</u>, the court noted that Congress had specifically overruled a Supreme Court decision extending the FLSA to workers at an American military base abroad by amending the statute to add Section 213(f), and that, as a result, the FLSA "<u>explicitly</u> does not apply abroad." <u>Id</u>. at 558-59 (emphasis in original). | |
| 3.    From the first week of June 2007, when Sarviss deployed to Pakistan, to the first week of September 2007, when he returned to the United States and his employment with GDIT ended, Sarviss performed services in the Islamic Republic of Pakistan -- "a workplace within a foreign country." (Sarviss Depo. 125:15-126:1.) | 3. Sarviss is entitled to the protections of the FLSA for any pay period when all or a portion of his work was done within the United States. The defense assertions regarding "the first week of June 2007" are too vague and unsupported by any evidence regarding the date on which Sarviss arrived in Pakistan. See Sarviss Decl,, Ex. 2, the June 6, 2007 receipt from Albertson's in California. |
| 4.    Sarviss cannot maintain a claim for overtime under the FLSA relating to that period of time. | 4. Sarviss is entitled to the protections of the FLSA for any pay period when all or a portion of his work was done within the United States. |
| **B. <u>Sarviss Was Not a "Highly-Compensated" Exempt Employee.</u>** | |
| 5.    Sarviss cannot maintain an FLSA | 5. Sarviss was not earning at least |

| | |
|---|---|
| overtime claim for the approximately two weeks he attended pre-deployment training classes in North Carolina and Texas because he was a "highly compensated" exempt employee under the FLSA. | $100,000 per year during the period at issue and, accordingly, was not highly compensated for this period. The defense has admitted that Sarviss had an annual salary of only $83,200, far less than $100,000. See defense allegedly uncontroverted facts 39-41. |
| 6.    An employee satisfies this exemption if:  (1) the employee has a "total annual compensation of at least $100,000"; (2) "the employee customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee"; and (3) the employee's "primary duty includes performing office or non-manual work." See 29 C.F.R.    § 541.601(a)- (d).  Sarviss satisfied all three requirements. | 6. Sarviss did not satisfy the exemption since he did not have total annual compensation of at least $100,000; he did not customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee; and the employee's primary duty did not include performing office or non-manual work. |

**1.    GDIT Did Not Pay Sarviss in Excess of $100,000 in Total Annualized Compensation.**

| | |
|---|---|
| 7.   To satisfy this exemption, the employee's "total annual compensation" must total or exceed $100,000, including "at least $455 per week paid on a | 7.   Sarviss did not enjoy annualized compensation of over $100,000 per year on account of the time he spent preparing for deployment, in the United States.  The defense has not offered any |

| | |
|---|---|
| salary or fee basis," plus any "commissions, nondiscretionary bonuses and other nondiscretionary compensation earned during a 52-week period." <u>See</u> 29 C.F.R. § 541.601(b). For an employee like Sarviss who does not work for the employer for a full year, the exemption applies if the employee is paid a pro rata portion of $100,000 minimum based upon the number of weeks he was employed. <u>See</u> 29 C.F.R. § 541.601(b)(3). | evidence that Sarviss was entitled to nondiscretionary bonuses.  Finally, the "International Assignment Provisions for John D. Sarviss" asserts that GDIT "does not guarantee your employment for any specific period of time and . . . . GDIT may terminate your employment at any time, [f]or any reason, with or without notice."  (<u>Id.</u>, JS 000001001) Sarviss Decl., ¶6. |
| 8.  GDIT paid Sarviss more than $100,000 in annualized compensation, consisting of four components:  (1) an annual salary of $83,200.00; (2) an additional 20% percent of his base salary in "Hardship Differential" while he was in Pakistan; a (3) an additional 25% of his base salary in "Danger Pay" while in Pakistan; and (4) a $30,000.00 "completion bonus."  (Sarviss Depo. 65:15-67:3; 67:15-68:4; | 8.  Sarviss did not enjoy annualized compensation of over $100,000 per year on account of the time he spent preparing for deployment, in the United States.  The defense has not offered any evidence that Sarviss was entitled to nondiscretionary bonuses.  Pursuant to Rule 602 of the Federal Rules of Evidence, Plaintiff objects to the Thompkins Declaration in connection with these "facts" for there is no foundation that his evidence in this regard is from personal knowledge. |

| | |
|---|---|
| 69:6-20; 72:10-14; 116:13-23; 140:14-141:13; 144:13-15 & Ex. 6; Thompkins Decl., ¶ 11 & Ex. B.) | |
| 9. Specifically, during the four weeks Sarviss spent in North Carolina, Texas and California, GDIT paid him his base weekly salary of $1,600.00, without Danger Pay or Hazard Differential. (Thompkins Decl., ¶ 11 & Ex. B.) For the 12 weeks Sarviss spent working in Pakistan, GDIT paid him his base salary plus Danger Pay and the Hardship Differential, for a total weekly salary of $2,320.00. (Sarviss Depo. 140:16-144:15; Thompkins Decl., ¶ 11 & Ex. B.) | 9. Sarviss did not enjoy annualized compensation of over $100,000 per year on account of the time he spent preparing for deployment, in the United States. The defense has not offered any evidence that Sarviss was entitled to nondiscretionary bonuses. Pursuant to Rule 602 of the Federal Rules of Evidence, Plaintiff objects to the Thompkins Declaration in connection with these "facts" for there is no foundation that his evidence in this regard is from personal knowledge. |
| 10. Sarviss's average weekly salary is calculated as follows. For four weeks, GDIT paid Sarviss $6,400.00 in total compensation ($1,600.00 x 4 weeks). (Thompkins Decl., ¶ 11 & Ex. B.) For the 12 weeks he spent working in Pakistan, GDIT paid | 10. Sarviss did not enjoy annualized compensation of over $100,000 per year on account of the time he spent preparing for deployment, in the United States. The defense has not offered any evidence that Sarviss was entitled to nondiscretionary bonuses. |

Sarviss $27,840.00 in total compensation ($2,320 x 12 weeks). (Id.) Taking Sarviss's total salary received over the course of his employment ($6,400.00 in total compensation in the United States + $27,840.00 in total compensation while working in Pakistan = $34,240.00) and dividing it by 16 weeks yields a weighted weekly average of $2,140.00. Multiplying the weighted weekly average salary ($2,140.00) by 52 weeks yields Sarviss' annualized salary ($111,280.00), excluding the additional $30,000.00 completion bonus GDIT paid him. Thus, Sarviss's average weekly salary was $2,140.00, and over a 52- week period, excluding the completion bonus, Sarviss' annual compensation would have totaled $111,280.00. Sarviss meets the $100,000.00 threshold under Section 541.601(b).

**2. <u>Sarviss Did Not Customarily and Regularly Perform at Least One Exempt Duty under both the Administrative and Professional Exemptions.</u>**

| | |
|---|---|
| 11. Under the second prong of the "highly-compensated" employee exemption, the employee must "customarily and regularly perform[] any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee." 29 C.F.R. § 541.601(a). Here, Sarviss performed at least one such duty of both an administrative and professional exempt employee. | 11. Under the second prong of the "highly-compensated" employee exemption, the employee must "customarily and regularly perform[] any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee." 29 C.F.R. § 541.601(a). Here, Sarviss did not perform at least one such duty of both an administrative and professional exempt employee. |
| 12. The FLSA requires an administratively exempt employee's primary duty to be "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers," including "the exercise of discretion and independent judgment with respect to matters of | 12. Sarviss' primary duties were neither office duties nor non-manual work. |

| | |
|---|---|
| significance." 29 C.F.R. § 541.200(a)(2)-(3). | |
| 13. An employee's "primary duty" is determined "based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a). | 13. Sarviss' primary duties were neither office duties nor non-manual work. |
| 14. GDIT hired Sarviss to train Pakistani Air Force helicopter pilots in night flight operations. When performing that instruction, Sarviss "customarily and regularly" engaged in numerous duties of an "administrative" exempt employee. For example, he regularly exercised discretion and independent judgment in evaluating his students' varying skill levels, adjusting his lesson plans accordingly, taking away the controls from his students when appropriate, and returning the controls to the student (or not) based on his assessment of the student's ability. (Sarviss Depo. 157:11-163:5; 185:8-186:15.) | 14. Sarviss' primary duties were neither office duties nor non-manual work. |

| | |
|---|---|
| 15. Sarviss also performed exempt duties under the professional exemption.  The FLSA exempts as a "professional" an employee who performs "work … [r]equiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction."  29 C.F.R. § 541.300(a)(2)(i). | 15. Sarviss did not perform exempt duties under the professional exemption. |
| 16. Sarviss' job required him to use his knowledge, training and experience.  For example, GDIT required all applicants for Sarviss' position to "be recognized as an Army Master Aviator and be qualified as either an SIP or IP with in-depth experience in using NVGs."  (Sarviss Depo. 10:12-11:7; 14:4-23; 24:8-26:13; 39:6-11; 39:24-40:25; 43:17-44:5; 44:8-45:11; 45:17-19 & Exs. 1 & 3.)  To meet these standards, Sarviss had completed specific coursework to become an SIP in | 16. That Sarviss' job required him to use his knowledge, training and experience does not make his work exempt. |

| | |
|---|---|
| addition to accruing thousands of flight hours. (Id.) | |
| 17. Sarviss customarily and regularly used his advanced knowledge as a basis to exercise his independent judgment. (Sarviss Depo. 128:1-130:17; 131:8-132:8.) | 17. That Sarviss' job required him to use his knowledge, training and experience does not make his work exempt. |
| 18. The "professional" exemption also applies to employees engaged in instruction, i.e., "teaching, tutoring, instructing or lecturing in the activity of imparting knowledge." 29 C.F.R. § 541.303(a). The FLSA regulations expressly include aircraft flight instructors as an example of exempt teaching professionals. 29 C.F.R. § 541.303(b). | 18. Sarviss' activites as a helicopter copilot do not constitute such "teaching, tutoring, instructing or lecturing in the activity of imparting knowledge" as to give rise to license for the defense to claim his work was performed under the "professional" exemption. |
| 19. Sarviss was not simply performing "routine" tasks while in Pakistan. He repeatedly applied his intellect, training and extensive experience to make life-and-death decisions, literally "on the fly," while instructing his trainees. 29 C.F.R. § 541.301(b). | 19. Sarviss was a helicopter co-pilot, requiring that he concentrate on his work in a fashion utterly distinct from the activities of commercial airline pilots. See Sarviss Decl., ¶ 23. |

- 47 -

These are the specific sorts of duties that GDIT hired Sarviss to perform, and that he did perform. See Paul v. Petroleum Equip. Tools, Co., 708 F.2d 168, 172-73 (5th Cir. 1983) (ruling that extensive training like that required by Federal Aviation Administration requirements for a commercial pilot's license and instrument rating can be the type of special instruction in a field of science or learning required to be classified as a professional employee).

| | |
|---|---|
| 20. Satisfying this prong of the "highly-compensated" employee exemption does *not* require a detailed analysis of Sarviss' job duties, or that his "primary duty" involved administrative or professional exempt work. Rather, Sarviss simply must have customarily and regularly performed one administrative *or* professional exempt duty. See 29 C.F.R. § 541.601(c)(3). He did | 20. Sarviss did not customarily and regularly perform one administrative *or* professional exempt duty. |

- 48 -

| | |
|---|---|
| both. | |
| **3. <u>Sarviss' Primary Duty Involved Manual Labor of Flying a Helicopter.</u>** | |
| 21.Sarviss' primary duty, training Pakistani Air Force helicopter pilots for military night flight operations using NVGs, was not the type of physical labor intended to be excluded from the "highly compensated" exemption. | 21. Sarviss was a helicopter co-pilot, requiring that he concentrate on his work in a fashion requiring a high degree of physical labor. |
| 22.The FLSA regulations and court opinions interpreting them, provide guidance regarding the types of duties considered to be manual work:  "<u>Routine</u> manual and physical work" involves "<u>repetitive</u> operations with [the employees'] hands, physical skill and energy."  <u>See</u> 29 C.F.R. §§ 541.3, 541.601(d).  Employees considered to routinely engage in such work include "mechanics, carpenters, construction workers, [and] laborers."  29 C.F.R. §§ 541.3, 541.601(d). | 22.  According to Sarviss, acting as a helicopter pilot:  "is a tender and delicate balancing act, not unlike juggling on a unicycle. Flying a helicopter such as the one I used in Pakistan requires constant manual effort. It is <u>routine</u> manual and physical work involving <u>repetitive</u> operations with the pilot's hands, physical skill and energy." Sarviss Decl., ¶23. |
| 23.Sarviss performed the highly specialized non-manual duties of | 24.  Sarviss did not perform the highly specialized non-manual duties of an |

| | |
|---|---|
| an aircraft flight instructor, not those of a manual laborer. Sarviss met with his students, evaluated their skill and experience level, and rode along with them on flights. He sat in the cockpit, demonstrated the skills he was teaching, and supervised his trainees while they flew the helicopter. Far from engaging in repetitive or routine manual labor, Sarviss took the controls of the helicopter away from his students (as would any typical flight instructor) when *he* thought it was necessary based on his evaluation of the situation. (Sarviss Depo. 158:12-160:1; 185:25-186:15.) | aircraft flight instructor. According to Sarviss, acting as a helicopter pilot: "is a tender and delicate balancing act, not unlike juggling on a unicycle. Flying a helicopter such as the one I used in Pakistan requires constant manual effort. It is <u>routine</u> manual and physical work involving <u>repetitive</u> operations with the pilot's hands, physical skill and energy." Sarviss Decl., ¶23. |
| 24. Even if Sarviss occasionally completed manual tasks, performing some manual tasks "only incidental to [the] primary duty" does not make an employee non-exempt. <u>See</u> <u>Ferrell v. Gwinnett County Board of Educ.</u>, 481 F. Supp. 2d 1338, 1345 (N.D. Ga. 2007). | 24. Sarviss did not perform the highly specialized non-manual duties of an aircraft flight instructor. According to Sarviss, acting as a helicopter pilot: "is a tender and delicate balancing act, not unlike juggling on a unicycle. Flying a helicopter such as the one I used in Pakistan requires constant manual effort. It is <u>routine</u> manual and physical work |

| | |
|---|---|
| | involving <u>repetitive</u> operations with the pilot's hands, physical skill and energy." Sarviss Decl., ¶23. |

### C. <u>Sarviss Was Not an "Administrative" Exempt Employee.</u>

| | |
|---|---|
| 25. GDIT is entitled to summary judgment on Sarviss' FLSA claim on the independent grounds that his job duties satisfied the "administrative" exemption. Specifically, Sarviss': (1) compensation satisfied the salary basis test; and (2) job duties satisfied the substantive "administrative" exemption requirements. | 25. Sarviss duties did not satisfy the administrative exemption. |

### 1. <u>Sarviss' Compensation Did Not Satisfy the Salary Basis Test.</u>

| | |
|---|---|
| 26. In order to satisfy the "salary basis test" under the FLSA, GDIT paid him an average weekly salary of $2,140, (Thompkins Decl., ¶ 11), well in excess of the required amount. | 26. Sarviss had a salary of under $100,000 per year, and the defense failed to offer any admissible evidence that he had any nondiscretionary entitlement to a bonus or bonuses. Pursuant to Rule 602 of the Federal Rules of Evidence, Plaintiff's objection to the Thompkins Declaration in connection with these "facts" should be |

| | |
|---|---|
| | sustained, for there is no foundation that his evidence in this regard is from personal knowledge. |

**2. Sarviss' Primary Job Duty Was Not Administrative Exempt.**

| | |
|---|---|
| 27. The FLSA requires an administratively exempt employee's primary duty, i.e., his "principal, main, major, or most important duty," 29 C.F.R. § 541.700(a), to be "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers," including "the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(2)-(3). Section 541.201(c) expressly provides that employees who -- like Sarviss -- act as advisers or consultants to their employer's clients or customers may qualify as | 27. Sarviss' primary duty was neither office work nor non-manual work. |

| | |
|---|---|
| administratively exempt.  <u>See</u> 29 C.F.R. § 541.201(c). | |
| 28. Sarviss' GDIT duties -- acting as an adviser to train Pakistani Air Force pilots in night flight operations -- required him regularly to exercise discretion and independent judgment on matters of significance (i.e., literally up to and including life and death decisions).  He did so -- frequently one-on-one in the cockpit with his students -- with virtually no supervision. | 28.  Sarviss' primary duty was neither office work nor non-manual work. |
| 29. For example, Sarviss worked with different students at different times, (Sarviss Depo. 157:11-158:16), and tailored his lesson plans based on his independent evaluation of each student's skills and abilities.  When students became disoriented, Sarviss would use his discretion to decide if and when to take the controls away from the trainee.  If and when (in Sarviss' opinion) the trainee was ready to resume flying | 29. Sarviss' primary duty was neither office work nor non-manual work. |

| | |
|---|---|
| the helicopter, Sarviss would return the controls to the trainee to fly back to the base (or not, as he decided).  (Sarviss Depo. 157:11-158:16; 158:22-163:5; 185:8-24.) Sarviss was "constantly monitoring the instruments, taking the controls away from them … making sure that they [we]re seeing what [he was] seeing, that they [we]re interpreting the terrain correctly."  (Sarviss Depo. 158:12-160:1; 185:25-186:15.) | |
| 30. Sarviss, on his own initiative, instituted a rule that the pilot needed to return the helicopter with 700 pounds of fuel remaining, and he would adjust mission profiles accordingly. (Sarviss Depo. 184:7-185:7.) *Sarviss* couched his rule in terms of life and death: "And that wasn't a rule of the Pakistan [sic].  That was something I instituted, because they had some people that got killed just | 30. Sarviss' primary duty was neither office work nor non-manual work. |

| | |
|---|---|
| before I got over there. And I wasn't going to stand for any more of that nonsense because they weren't qualified to be flying the aircraft and they got caught in a sand storm and they got dead…. And I didn't want to see anybody dead over there any more than needed to be. So that's what I did." (Sarviss Depo. 184:25-185:7.) | |
| 31. Sarviss also prepared instrument approaches for "divert" fields; located a survival escape and evasion area, and created and put into place a plan; and conducted approximately 10 "captain check rides," during which he would evaluate and certify a trainee as an aircraft commander. (Sarviss Depo. 165:20-166:9, 199:22-200:6; 200:12-16.) | 31. Sarviss' primary duty was neither office work nor non-manual work. |
| 32. Sarviss largely was in charge of the mission. Specifically, Sarviss testified at deposition that the | 32. Sarviss' primary duty was neither office work or non-manual work. |

purported team leader, GDIT
employee John Landis, was not
qualified to be an instructor pilot
because he had failed a "check
ride" with the Pakistani Base
Commander, Lieutenant Colonel
Shahid.  (Sarviss Depo. 133:14-
134:14; 161:16-163:22.)  Sarviss
further testified that "he could not
rely on Landis" or the Base
Commander because Landis "was
not qualified to carry [Sarviss']
helmet bag," and the Commander
"wasn't qualified to fly the
aircraft or fly with [NVGs]."
(Sarviss Depo. 162:20-163:5,
164:4-165:10.)  Because of this
lack of qualifications, Sarviss
claims the Pakistani Air Force
made *him* the SIP for the entire
squadron.  (Sarviss Depo. 162:20-
163:5.)  Sarviss also wrote to one
of GDIT's competitors, Camber,
that "[GDIT] didn't pull [the
Pakistan mission] off.  We did."
By that, Sarviss meant himself
and his colleague, Ken Lazorchak.

| | |
|---|---|
| (Sarviss Depo. 227:14-228:25, Ex. 13.)  Thus, by his own contention, Sarviss' duties were of the type required to satisfy the "administrative" exemption. | |
| 33. The Court also may combine -- or "tack" -- Sarviss' administrative duties with his professional flight instructor duties in order to find Sarviss was exempt under the FLSA.  29 C.F.R. § 541.708 ("Employees who perform a combination of exempt duties as set forth in the regulations in this part for executive, administrative, professional, outside sales and computer employees may qualify for exemption."). | 33.  Sarviss' primary duty was neither office work nor non-manual work. |
| 34. GDIT did not ask Sarviss to work at all, let alone work overtime, during the approximately two weeks he spent at home in California after his training but before he deployed to Pakistan. (Sarviss Depo. 113:21-115:21.)  Thus, any FLSA claim by Sarviss relating to that time also fails. | 34. The information communicated from Landis to Sarviss while Sarviss was in California was sufficient to require Sarviss to work while in California, and Sarviss may combine one or more days of work in California with his travel time to Pakistan and work done in Pakistan during his initial pay period there to secure protection under the |

| | |
|---|---|
| | FLSA. |
| 35. In sum, the FLSA did not apply to Sarviss' employment in Pakistan. If the FLSA did apply, Sarviss' work both in Pakistan and the United States was exempt under the "highly-compensated" employee and "administrative" employee exemptions.  For each of these reasons, this Court grants GDIT summary judgment on Sarviss' FLSA overtime claim. | 35. The defense has failed to prove that Sarviss cannot have a claim under the FLSA. |

**II.    GDIT IS NOT ENTITLED TO SUMMARY JUDGMENT ON SARVISS' CALIFORNIA LAW CLAIMS.**

| | |
|---|---|
| 36. Sarviss' causes of action under California law (the "California claims") allege that GDIT violated the California Labor Code and Industrial Welfare Commission ("IWC") Wage Order 4-2001 (and, derivatively, California's Unfair Competition Law, or "UCL") in connection with Sarviss' employment.  Sarviss cannot apply California law to his work for GDIT outside California. | 36. Sarviss may apply California law to his work for GDIT outside of California. |

**A. Sarviss Does Not Base His California Claims Exclusively on Services He Provided Outside California.**

| | |
|---|---|
| 37.Sarviss bases his California law claims on services he provided to GDIT while outside California, i.e., in North Carolina, Texas and Pakistan, not the approximately two weeks he spent at home in California waiting to deploy to Pakistan.  Specifically, Sarviss admitted at deposition that:  (1) he did not provide any services at the direction of GDIT during those two weeks in California; (2) any work he did during that time was on his own initiative (Sarviss Depo. 113:21, 115:21); (3) GDIT did not ask him to work more than eight hours per day or forty hours per week during that time (id. 114:24, 115:5; 119:11, 15); and (4) he was able to take meal and rest breaks if he chose to do so and is not claiming he was denied meal or rest periods in California. (Id. 115:22, 116:8.)  See, e.g., White v. Starbucks Corp., 497 F. Supp. 2d 1080, 1087-89 (granting summary judgment for employer | 37.  Sarviss bases his California law claims on services he provided to GDIT while outside California, i.e., in North Carolina, Texas and Pakistan. |

| | |
|---|---|
| and holding that employee must show he was forced to forgo meal and rest breaks to survive summary judgment for such claims). | |
| 38. Sarviss confirms this in his recently-filed Declaration in support of his motion for class certification: "I was assigned [by GDIT] to work in North Carolina, Texas and Pakistan." (Sarviss Decl. in Supp. of Cl. Cert, ¶ 2, at 1.) Tellingly absent is any reference to California. Sarviss' purported California claims *necessarily* arise from services he performed outside California, and for that reason, they fail. | 38. The defense construction of Sarviss' Declaration in support of his motion for class certification is utterly unreasonable. |

**B.  The Dormant Commerce Clause of the United States Constitution Does Not Prohibit the Application of California Labor Law to Services Sarviss Performed Outside California.**

| | |
|---|---|
| 39. The Constitution grants Congress -- not the individual states -- the power to "regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3. The Commerce Clause both confers the | 39. The defense arguments regarding the Dormant Commerce Clause fail. <u>Industrial Welfare Commission v. Superior Court</u>, 27 Cal. 3d 690 (1980). |

| | |
|---|---|
| affirmative power on the federal government to regulate interstate commerce, and precludes the individual states from attempting to do so.  498 U.S. 439, 447, 111 S. Ct. 865, 870, 112 L. Ed. 2d 969 (U.S. 1991).  This substantive restriction on state regulation is referred to as the "Dormant" Commerce Clause. | |
| 40. The test for determining whether a state statute violates the Dormant Commerce Clause requires a balancing of the burdens on commerce against the interests of the state.  See United Airlines, Inc. v. Indus. Welfare Comm'n, 211 Cal. App. 2d 729, 28 Cal. Rptr. 238 (1963) (holding application of California regulation governing reimbursement of uniform expenses to employees who provided services primarily on international flights violated the Dormant Commerce Clause) (overruled on other grounds) | 40.  The defense arguments regarding the Dormant Commerce Clause fail. Industrial Welfare Commission v. Superior Court, 27 Cal. 3d 690 (1980). |

| | |
|---|---|
| ("United"); <u>Guy v. IASCO</u>, 2004 WL 1354300 (Cal. Ct. App. June 17, 2004) (declining to extend California labor laws to services performed outside of California) ("<u>Guy</u>"). | |
| 41. In <u>United</u>, the California Court of Appeal upheld a challenge to a California wage order provision purporting to require air carriers to pay for the uniforms of employees on interstate flights. Relying on the Dormant Commerce Clause, the Court first acknowledged that allowing the California regulation to apply would result in situations where different state rules would apply to the same flight crew working the same flight.  Noting that most other states had no such rules, the court held that allowing the California regulation to govern interstate flights would lead to "a most anomalous situation": <br><br> "A stewardess based in California gets a free | 41.  The defense arguments regarding the Dormant Commerce Clause fail. <u>Industrial Welfare Commission v. Superior Court</u>, 27 Cal. 3d 690 (1980). |

| | |
|---|---|
| uniform even though most, or perhaps all of her work is on interstate planes.  A stewardess based outside of California who works on planes coming into California does not. Likewise, on interstate flights there might very well be two stewardesses working side by side, one with a free uniform, the other with a uniform only a part of the cost of which United paid…. Such discrimination is bound to cause personnel troubles and to that extent, at least a burden on interstate commerce." 211 Cal. App. 2d at 748-49, 28 Cal. Rptr. at 248. | |
| 42. The court specifically rejected the State of California's asserted interest of increasing the pay of California-based flight attendants, holding that it simply did not | 42.  The defense arguments regarding the Dormant Commerce Clause fail. <u>Industrial Welfare Commission v. Superior Court</u>, 27 Cal. 3d 690 (1980). |

[PROPOSED] STMT OF UNCONTROVERTED FACTS & CONCLUSIONS OF LAW
CV08-1484 DDP (CWX)

| | |
|---|---|
| justify the burden that the regulation regarding uniforms placed on interstate commerce. 211 Cal. App. 2d at 748-49, 28 Cal. Rptr. at 248. Thus, the court held that the California regulation at issue could not constitutionally be applied to flight attendants in interstate commerce. 211 Cal. App. 2d at 748-49, 28 Cal. Rptr. at 239. | |
| 43. In <u>Guy</u>, the California Court of Appeal similarly held that the regulation of overtime pay of employees who work in interstate and foreign commerce is a direct regulation of such commerce, and that a California statute seeking to regulate commerce outside the state boundaries violates the Commerce Clause. 2004 WL 1354300 at *7 (<u>citing</u> <u>United</u>, 211 Cal. App. 2d at 733-34). In <u>Guy</u>, the plaintiff flight engineers sued their employer, IASCO, for failure to pay overtime and other compensation. IASCO, a | 43. The defense arguments regarding the Dormant Commerce Clause fail. <u>Industrial Welfare Commission v. Superior Court</u>, 27 Cal. 3d 690 (1980). |

| | |
|---|---|
| California company, had, in effect, "leased" the plaintiffs to Japan Airlines, Ltd. | |
| 44. The plaintiffs in <u>Guy</u> performed the vast majority of their work outside of California, serving as flight engineers almost exclusively on international flights. Referring to the <u>United</u> decision, the court commented that "[t]he disparate treatment of flight personnel in the payment of overtime is even less tolerable than differences in uniform allowances." <u>Id</u>. at *6 (ruling that "[a]n international carrier cannot be expected to follow the regulations of 50 states regarding overtime pay when it comes to the pay of personnel who, as is the case with [plaintiffs] work mainly, if not exclusively, in international flights"). | 44. The defense arguments regarding the Dormant Commerce Clause fail. <u>Industrial Welfare Commission v. Superior Court</u>, 27 Cal. 3d 690 (1980). |
| 45. The <u>Guy</u> court accordingly held that the Dormant Commerce Clause prevented the application of California wage laws to all of | 45. The defense arguments regarding the Dormant Commerce Clause fail. <u>Industrial Welfare Commission v. Superior Court</u>, 27 Cal. 3d 690 (1980). |

| | |
|---|---|
| the plaintiffs, including one former employee who -- *like Sarviss* -- was a California resident. 2004 WL 1354300 at *4, 7. | |
| 46. GDIT hires personnel from numerous states to perform services both in the various states and abroad, that is, in interstate and international commerce. (Thompkins Decl., ¶ 4.) Sarviss provided the services at issue *exclusively* outside California, working side by side with teammates who were residents of other states. (Sarviss Depo. 138:1-23; Thompkins Decl., ¶¶ 7, 9.) | 46. The defense arguments regarding the Dormant Commerce Clause fail. Industrial Welfare Commission v. Superior Court, 27 Cal. 3d 690 (1980). |
| 47. If California employment laws -- which impose different requirements than other state laws and the FLSA -- were to apply to Sarviss' employment while he was in North Carolina, Texas or Pakistan, then GDIT would have to provide him with one set of reimbursement rights, | 47. The defense arguments regarding the Dormant Commerce Clause fail. Industrial Welfare Commission v. Superior Court, 27 Cal. 3d 690 (1980). |

| | |
|---|---|
| compensation, and meal and rest breaks based on California law, while simultaneously providing different terms and conditions of employment to other members of the very same team providing the very same services at the very same time -- solely on the basis that they happened to reside in different states.[2] | |
| 48. The imposition on interstate and foreign commerce of these sorts of administrative and cost burdens is precisely what the Dormant Commerce Clause prohibits. United, 211 Cal. App. 2d at 748-49, 28 Cal. Rptr. at 248, Guy, 2004 WL 1354300 at *7. | 48.  The defense arguments regarding the Dormant Commerce Clause fail. Industrial Welfare Commission v. Superior Court, 27 Cal. 3d 690 (1980). |

**C. California Law May Apply Beyond Its Geographic Borders.**

| | |
|---|---|
| 49. There exists a long-standing and well-established presumption in California that the State's "statutes generally do not have | 49. As far as applying California wage-and-hour law to California residents who perform work outside of California, the California court in which suit is brought |

---

[2] This argument assumes, in part, that Sarviss was a "non-exempt" employee under California law who would be entitled to overtime and meal and rest breaks.  As demonstrated below, however, Sarviss' job duties satisfied the California law "administrative" exemption, which is a separate basis to grant GDIT summary judgment.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

extraterritorial effect." Diamond Multimedia Systems, Inc. v. Superior Court, 19 Cal. 4th 1036, 1058-59, 80 Cal. Rptr. 2d 828, 842-43 (1999); North Alaska Salmon Co. v. Pillsbury, 174 Cal. 1, 4, 162 P. 93, 94 (1916) (ruling that California's intent to make an "act operative, with respect to occurrences outside the state, will not be declared to exist unless such intention is clearly expressed or reasonably to be inferred from the language of the act or from its purpose, subject matter or history.").

applies the following test in order to determine which jurisdiction's wage-and-hour laws apply: "First, the court must determine whether the California law and the potentially applicable law of another state are 'materially' different. [*Washington Mut. Bank v. Superior Court*, 24 Cal. 4th 906 (2001).] Here, the defense has offered no evidence regarding the law of any other jurisdiction, and this Court should assume that there is no difference between California law and the applicable laws of the other jurisdictions, and, accordingly, apply California law rather than a the sub silencio argument of GDIC and apply no law, at all. The defense admits that over 12% of Sarviss' time working for it was while he was in California: "GDIT employed Sarviss for a grand total of 16 weeks -- approximately two weeks of predeployment training in North Carolina and Texas, about two weeks in California awaiting deployment to Pakistan . . . and 12 weeks in Multan, Pakistan." Def. Mem., 1:7-11. It is also

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| | |
|---|---|
| | undisputed that Sarviss was hired in California and that GDIT treated him as a California-based employee, deducting California taxes and California workers' compensation and unemployment insurance premiums from his paychecks. Further, Sarviss contract provided that he would be returned to California after his deployment, and, indeed, Defendant promised to reimburse Sarviss for the costs of returning him to Calfironia. There is no basis for the defense claim that "Sarviss admits that his claims do *not* arise from any services he provided in California." Def. Mem. 1:19-20. The defense arguments regarding the extraterritorial application of the California Labor Code are factually intensive, inappropriate for summary judgment. The defense should be estopped from arguing that no law regulates its employment of Sarviss. |
| 50. None of the California Labor Code provisions or Wage Order 4-2001 purportedly relied upon by Sarviss express any intention by | 50. The defense arguments regarding the extraterritorial application of the California Labor Code are factually intensive, inappropriate for summary |

- 69 -

| | |
|---|---|
| the California Legislature even to *attempt* to apply extraterritorially, let alone actually do so. | judgment. The defense should be estopped from arguing that no law regulates its employment of Sarviss. |
| 51. Sections 1173 and 1193.5 of the California Labor Code -- two statutes providing state agencies the authority to regulate working conditions -- express an intent to regulate working conditions only *inside* California and not in any other state.  <u>See</u> Cal. Lab. Code § 1173 (California's IWC is required to ascertain information about wages, hours and working conditions "<u>in this state</u>") (emphasis added); Cal. Lab. Code § 1193.5 (the California Department of Labor Standards Enforcement is authorized to investigate the wages, hours and working conditions "of all employees employed in any occupation <u>in this state</u>") (emphasis added). | 51. The defense arguments regarding the extraterritorial application of the California Labor Code are factually intensive, inappropriate for summary judgment.  The defense should be estopped from arguing that no law regulates its employment of Sarviss. |
| 52. Few courts have addressed the | 52.  The defense arguments regarding |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

issue of whether California wage and hour laws may be applied elsewhere.  However, the courts that have done so, including this Court, uniformly have declined to extend the regulatory scope of the California Labor Code and UCL to services performed outside California's geographic boundaries.  See, e.g., Priyanto v. M/S Amsterdam, et al., 2009 WL 175739 at *8 (C.D. Cal. Jan. 23, 2009) (following Guy v. IASCO and holding that non-resident plaintiff's California wage and hour and UCL claims did not apply because plaintiff did not work in California); Tidenberg v. Bidz.com, Inc., 2009 WL 605249 at *4 (C.D. Cal. Mar. 4, 2009) (holding UCL did not apply to claims of non-residents arising from conduct occurring entirely outside of California).[3]

the extraterritorial application of the California Labor Code are factually intensive, inappropriate for summary judgment. The defense should be estopped from arguing that no law regulates its employment of Sarviss.

---

[3] In Sullivan v. Oracle Corp., 557 F.3d 979 (9th Cir. Feb. 17, 2009), the Ninth Circuit Court of Appeal recently withdrew its previous decision permitting non-residents of California who performed some of their work *inside* California to assert claims under the California Labor Code overtime provisions and the UCL.  See Sullivan v. Oracle Corp., 547 F.3d 1177, 1181 (9th Cir. 2008).  There -- unlike here

| | |
|---|---|
| 53. In <u>Guy</u>, the California Court of Appeal held that California laws governing overtime pay could not be applied to employees working primarily outside of California. 2004 WL 1354300 at *1. The Court reached this conclusion despite the fact that IASCO was a California corporation that engaged in the preparation of payroll and paychecks in California. <u>Id</u>. at *5. Noting that none of the California Labor Code provisions at issue expressly provided for extraterritorial application, the <u>Guy</u> court held that the wage orders did not apply to "nonresidents working for a foreign corporation (Japan Ltd.) in interstate and foreign commerce, who make an occasional stop in California." <u>Id</u>. at *4. | 53. The defense arguments regarding the extraterritorial application of the California Labor Code are factually intensive, inappropriate for summary judgment. The defense should be estopped from arguing that no law regulates its employment of Sarviss. |
| 54. Guy primarily involved California nonresidents. However, with respect to the one employee who | 54. The defense arguments regarding the extraterritorial application of the California Labor Code are factually |

-- the plaintiffs sought to apply California law only to days or weeks where they performed some or all of their work *inside* California. Sarviss, in contrast, purports to apply California law to services he provided exclusively *outside* California.

| | |
|---|---|
| resided in and received pay in California, the Court noted that he, too, worked more than 90 percent of the time outside of California, id. at *4, implying that California overtime laws also did not apply to him.  The court, however, ultimately ruled that it did not need to decide this issue for the California resident because, as discussed above, the Dormant Commerce Clause forbid application of California's IWC wage orders to all of the plaintiffs, including the California resident. Id. | intensive, inappropriate for summary judgment. The defense should be estopped from arguing that no law regulates its employment of Sarviss. |
| 55. In Tidewater Marine Western, Inc. v. Bradshaw, 14 Cal. 4th 557, 578, 59 Cal. Rptr. 2d 186, 199 (1996), the seamen at issue primarily worked in the Santa Barbara Channel off the coast of California.  The issue before the California Supreme Court was *not* whether California's Labor Code could be applied extraterritorially. Rather, the court first determined | 55.  The defense arguments regarding the extraterritorial application of the California Labor Code are factually intensive, inappropriate for summary judgment. The defense should be estopped from arguing that no law regulates its employment of Sarviss. |

that the Santa Barbara Channel fell *within* California's territorial boundaries.  Based on this determination, the court held that seamen who work in California are "wage earners of California" and, thus, were subject to California wage laws.  Id. at 578-79, 59 Cal. Rptr. 2d at 199.  The court specifically declined to address the issue of whether persons who resided in California, but worked primarily outside the state's boundaries, were subject to the protections of the California Labor Code.  Id. at 579, 59 Cal. Rptr. 2d at 199.

56. Accordingly, the court in Guy appropriately rejected the plaintiffs' arguments that the Tidewater decision required the application of IWC wage orders to their employment, which was primarily based outside of California.  Rather, the Court noted that Tidewater "states that the Legislature may have intended

56.  The defense arguments regarding the extraterritorial application of the California Labor Code are factually intensive, inappropriate for summary judgment. The defense should be estopped from arguing that no law regulates its employment of Sarviss.

| | |
|---|---|
| to give extraterritorial effect to wage orders '...in limited circumstances, such as when California residents working for a California employer travel <u>temporarily</u> outside the state during the course of the normal workday <u>but return to California at the end of the day</u>.'" 2004 WL 1354300 at *4 (emphasis added.). Here, Sarviss performed *all* of the services at issue outside California. | |
| 57. Sarviss also contends that California wage and hour laws should apply to his employment in North Carolina, Texas and Pakistan because he was a resident of California and he was "hired out of California" -- by which he means his employment offer letter was sent to him in California, he signed it in California, and he paid California income taxes on his GDIT compensation. (Sarviss Depo. 77:13-79:24; 92:5-93:2.) None of | 57. The defense arguments regarding the extraterritorial application of the California Labor Code are factually intensive, inappropriate for summary judgment. The defense should be estopped from arguing that no law regulates its employment of Sarviss. |

| | |
|---|---|
| these facts, however, overcome the presumption against extraterritorial application, both because Sarviss did not perform any of the work at issue in California, and because he cannot point to any evidence that the Legislature intended to apply California wage and hour laws to his employment outside the state. | |
| 58. Thus, GDIT is entitled to summary judgment on Sarviss' California claims on this additional and independent basis. | 58. The defense arguments regarding the extraterritorial application of the California Labor Code are factually intensive, inappropriate for summary judgment. The defense should be estopped from arguing that no law regulates its employment of Sarviss. |
| 59. GDIT also is entitled to summary judgment on Sarviss' claims which attempt to apply California law to his training at Ft. Bragg, North Carolina on the additional basis that the training occurred on a federal enclave subject to the exclusive jurisdiction of federal -- | 59. The defense arguments regarding the extraterritorial application of the California Labor Code are factually intensive, inappropriate for summary judgment. The defense should be estopped from arguing that no law regulates its employment of Sarviss. Here, there is no competent evidence in |

not state -- law. A "federal enclave" is real property obtained and held by the U.S. government under article I, Section 8, Clause 17 of the U.S. Constitution. See, e.g., Chicago, R.I. & P. Ry. Co. v. McGlinn, 114 U.S. 542, 546, 5 S. Ct. 1005, 1006, 29 L. Ed. 270 (U.S. 1885). State law claims are displaced on exclusive federal enclaves, where only federal law applies to govern all civil acts, deeds and disputes arising from activities conducted on such property. See, e.g., Stiefel v. Bechtel Corp., 497 F. Supp. 2d 1138, 1147-51 (S.D. Cal. 2007). Courts routinely have taken judicial notice that military bases are federal enclaves subject to the exclusive jurisdiction of the United States. See, e.g., Chicago, 114 U.S. at 547; Willis v. Craig, 555 F.2d 724, 726 (9th Cir. 1977); Cooper v. Southern California Edison Co., 170 Fed. Appx. 486, 2006 WL 616264, *1, No. 03-

the record that the training occurred on a federal enclave subject to the exclusive jurisdiction of federal -- not state -- law.

| | |
|---|---|
| 57059 (9th Cir. 2006). | |

**D. Sarviss Was an "Administrative" Exempt Employee under California Law.**

    **1. Sarviss' Compensation Satisfied the Salary Basis Test.**

| | |
|---|---|
| 60. In order to satisfy the "salary basis test" under California law, an employee must earn a monthly salary of at least $2,773.34. Wage Order 4, 2001; tit. 8 Cal. Code Regs. § 11040. GDIT paid Sarviss approximately $6,400.00 of gross salary per month, (Thompkins Decl., ¶ 11), satisfying that requirement. | 60. Sarviss was not an exempt employee under California law. |

    **2. Sarviss' Primary Job Duty Was Administrative Exempt.**

| | |
|---|---|
| 61. To satisfy the California law "administrative" exemption, an employee must primarily perform office or non-manual work duties "directly related to management policies or general business operations of his/her employer or his/her employer's customers." Wage Order 4, 2001; Tit. 8 Cal. Code Regs. § 11040. The | 61. Sarviss was not an exempt employee under California law. |

| | |
|---|---|
| employee must "customarily and regularly exercise[] discretion and independent judgment," and either "perform[] under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge," or "execute[] under only general supervision special assignments and tasks." | |
| 62. For all of the same reasons set forth above, Sarviss' GDIT duties, training Pakistani Air Force pilots in night flight operations utilizing NVGs, satisfied these requirements.  GDIT also is entitled to summary judgment on Plaintiff's California law claims on this independent ground. | 62.   Sarviss was not an exempt employee under California law. |

**III.   GDIT IS ENTITLED TO SUMMARY JUDGMENT ON SARVISS' CALIFORNIA LABOR CODE SECTION 2802 CLAIM.**

| | |
|---|---|
| 63. Sarviss alleges that GDIT did not reimburse him for certain purchases he made during his employment as purportedly required by California law. | 63. GDIT is not entitled to summary judgment with respect to Sarviss' claims under California Labor Code § 2802. |

(Complaint ¶¶ 72, 75.)  California Labor Code § 2802 requires an employer to reimburse its employee for "all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties."  Id.  As an initial matter, and setting aside the expenses Sarviss admits GDIT *has* reimbursed, to the extent Sarviss seeks reimbursement under California law for purchases made outside California (i.e., in North Carolina, Texas or Pakistan), Section 2802 does not apply for the reasons set forth above.

| | |
|---|---|
| 64. To the extent Sarviss is claiming that he should have been reimbursed for items purchased while he was in California waiting to be deployed to Pakistan, (Sarviss Depo. 113:21, 114:7), GDIT is entitled to summary judgment because Sarviss admits both that GDIT did not ask him to | 64. GDIT is not entitled to summary judgment with respect to Sarviss' claims California Labor Code § 2802.  GDIT has not established that Sarviss did not purchase the supplies at GDIT's direction.  This is an unresolved factual issue. |

| | |
|---|---|
| perform any services during that time, and that he did not purchase the supplies at GDIT's direction. (Sarviss Depo. 115:11, 21; 122:4, 123:12.)  Thus, Sarviss incurred any such expenses outside the course and scope of his employment, and *not* in "direct consequence" of performing his duties.  Cal. Labor Code § 2802; <u>Grissom v. Vons Companies</u>, 1 Cal. App. 4th 52, 60, 1 Cal. Rptr. 2d 808, 812 (1991) (obvious purpose of [Section 2802] "is to protect employees from suffering expenses in direct consequence of doing their jobs"); <u>People v. Short</u>, 160 Cal. App. 4th 899, 905, 73 Cal. Rptr. 3d 154, 158 (2008) (same).  For this reason, Sarviss' expenses allegedly incurred while he was at home in California waiting to be deployed to Pakistan also were not reimbursable, and GDIT is entitled to summary judgment on Plaintiff's claim. | |
| 65. In his pending motion for class | 65.  Although the words General |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

certification, Plaintiff argues that his paystubs violated California law because they allegedly did not clearly set forth the name of his employer.  Not true.  To the extent California law applied at all, the very first four words at the very top of each pay stub are "General Dynamics Information Technology," and to the right of those words is printed GDIT's Virginia address.  (Thompkins Decl., Ex. B)  That GDIT also included the name of its predecessor, Anteon Corporation, which it clearly identifies as a division of GDIT, (Thompkins Decl., Ex. A), does not somehow make this identification insufficient.

Dynamics Information Technology appear on the wage statements, that entity is not the legal name of the employer.  The legal name of the Defendant is GENERAL DYNAMICS INFORMATION TECHNOLOGY, INC.  Further, the wage statements are confusing, since there are three business entities referenced, and none is identified as the "employer."  Although the pay stubs reflect part of GDIT's name on the pay stub, it does not indicated whether it is in fact his employer, or if his employer is in fact Anteon Corp., which name is also listed on the pay stub, or whether Sarviss was an employee of General Dynamics Company, which name is also listed on the pay stub.  In addition, the wage statements fail to list the correct total overtime hours worked or provide detail regarding compensation for missed meal/rest breaks.  The wage statements also fail to indicate the total hours worked or the applicable hourly rates in effect during the pay period.

[PROPOSED] STMT OF UNCONTROVERTED
FACTS & CONCLUSIONS OF LAW
CV08-1484 DDP (CWX)

1

## **<u>CONCLUSION</u>**

2

Accordingly, for all of these reasons, summary judgment must be denied.

3

4

DATED: June 1, 2009                    Respectfully submitted,

5

6                                                    _____
                                                                /s/
7                                                    Alan Harris
                                                    David Zelenski
8                                                    *Attorneys for Plaintiff*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[PROPOSED] STMT OF UNCONTROVERTED
FACTS & CONCLUSIONS OF LAW
CV08-1484 DDP (CWX)