O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JOHN D. SARVISS, individually and on behalf of all others similarly situated, | ) ) ) ) | Case No. CV 08-01484 DDP (CWx) |
| | ) ) | **ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR** |
| Plaintiff, | ) ) ) | **SUMMARY JUDGMENT, DENYING MOTION FOR CERTIFICATION OF COLLECTIVE ACTION, AND DENYING MOTION FOR** |
| v. | ) ) | **CLASS CERTIFICATION** |
| GENERAL DYNAMICS INFORMATION TECHNOLOGY, INC., | ) ) ) | [Defendant's Motion for Summary Judgment filed on April 6, 2009; Plaintiff's Motions filed March |
| Defendant. | ) ) | 27, 2009] |
| _____ | ) | |

This matter comes before the Court on three motions filed by the parties. Plaintiff John D. Sarviss ("Sarviss" or "Plaintiff"), who brings this wage and hour case as a purported class action and collective action, has filed a Motion for Certification of a Collective Action as to his Fair Labor Standards Act ("FLSA") claims and a Motion for Class Certification of his California state wage and hour claims. In addition to opposing Plaintiff's certification motions, Defendant General Dynamics Information Technology ("GDIT" or "Defendant") moves for summary judgment on Plaintiff's claims. After reviewing the materials submitted by the

parties, hearing oral argument, and considering the issues raised

in both, the Court grants in part and denies in part Defendant's

Motion and denies Plaintiff's Motions for the reasons stated below.

**I.   BACKGROUND**

Plaintiff filed this action in California state court on

January 28, 2008 against his former employer, GDIT. GDIT provides

information technology solutions and services to military,

government, and commercial customers within the United States and

around the world, including, as relevant to Sarviss, in connection

with some of the United States' defense and homeland security

projects. Def.'s Statement of Uncontroverted Facts and Conclusions

of Law, ¶ 1; Pl.'s Statement of Genuine Issues in Opp'n to Def.

Statement, ¶ 1. Defendant removed the action to this Court on

March 3, 2008.

**A.   Plaintiff John Sarviss and His Employment with GDIT[1]**

In late April or early May 2007, Plaintiff John Sarviss saw

and responded to a GDIT job posting on the internet for "qualified

AH-1F and UH-1H/Bell 412 helicopter pilots to support [GDIT's]

aviation requirements in [P]akistan." DSUF ¶ 2 (quoting Garrison

Decl., Ex. A at 170); PSGI ¶ 2. AH-1F and UH-1H/Bell 412 are

models of helicopters used for military and defense purposes. Id.

The job posting required candidates to "be recognized as an Army

Master Aviator and be qualified as either an SIP or IP with in-

_____

[1]Except where noted, the Court draws these facts from the
parties' statements of uncontroverted and disputed facts. For ease
of reference, the Court uses the following abbreviations: for
Defendant's Statement of Uncontroverted Facts and Conclusions of
Law, "DSUF"; for Plaintiff's Statement of Genuine Issues, "PSGI";
and for Defendant's Reply Statement, "DSUFR."

depth experience using NVGs."[2]  Id. at ¶ 4 (quoting Garrison Decl.,
Ex. A at 170).  An "Army Master Aviator" must have 2,000 flight
hours.  Id. at ¶ 5.  The terms "SIP" and "IP" are acronyms for
Standardized Instructor Pilot and Instructor Pilot, respectively.
Id. at ¶ 6.  In addition to being a pilot instructor, an SIP
typically ensures that flight standards are consistent for all of
the IPs.  Id.

Plaintiff John Sarviss is a California resident and a former
United States Army helicopter pilot.  Compl. ¶ 1; Garrison Decl.,
Ex. A at 169.  Sarviss had approximately eight times the flight
hours required to be considered an Army Master Aviator, and his
background and training included coursework to become an SIP and
training and experience working with NVGs.  DSUF ¶ 7; PSGI ¶ 7.
Sarviss had flown helicopters, including AH-1F and UH-1H/Bell412
helicopters, for more than 16,000 hours and had approximately 4,700
hours flying at night and 260 hours of flying with NVGs.  Id. at
¶ 8.

On or about May 14, 2007, GDIT hired Sarviss to work with the
team of NVG helicopter pilot trainers in Pakistan.  Id. at ¶ 9.
Plaintiff's job title was "Operations Analyst V," a salaried
position classified as exempt from overtime by GDIT, and he held no
other positions with GDIT.  DSUF ¶ 11.[3]  On the basis of the
mission summary, Sarviss understood that his job would be "training
Pakistani helicopter pilots in night vision goggle combat tactics

---

[2]"NVG" stands for Night Vision Goggles.

[3]Plaintiff's objections to DSUF ¶ 11 do not go to these facts.
It is undisputed that Plaintiff's job title was Operations Analyst
V.  Garrison Decl., Ex. A at 91.

1   in support of the global war on terror." Garrison Decl., Ex. A

2   (Sarviss Deposition) at 30:8-12.

3        GDIT's contract with the U.S. Government required Sarviss to

4   complete his training before deploying to Pakistan. DSUF ¶ 14;

5   PSGI ¶ 14. Immediately after being hired, from May 14 to May 18,

6   2007, Sarviss attended the U.S. Army Security Assistance Team

7   Training Orientation Course at Fort Bragg, North Carolina. Id. at

8   ¶ 13. These training sessions, which included other trainees

9   deploying to countries all over the world, addressed topics related

10  to Sarviss's mission, including an orientation about Pakistan,

11  counter-surveillance, counter-terrorism procedures, weapons

12  training, and hostage surivival. Id. at ¶ 15. The training

13  courses at Fort Bragg lasted one work week for eight hours each

14  day. Garrison Decl., Ex. A at 50:18-22. Sarviss claims that he

15  spent an additional 20 hours that week engaging in tasks to prepare

16  for his deployment, including obtaining equipment at Pope Air Force

17  Base, filling out additional paperwork, receiving the necessary

18  vaccinations, and obtaining his passport, visa, and contractor

19  access card. DSUF ¶ 18; PSGI ¶ 18. Shortly after completing the

20  training at Fort Bragg, Sarviss attended a five-day flight safety

21  course in the Dallas/Forth Worth, Texas area. Id. at ¶ 19. The

22  course was provided by a third party and served as a refresher

23  training for flying the Bell 412 helicopter in which Sarviss would

24  be training members of the Pakistani Air Force. Id. at ¶ 20.

25  While at that training, Sarviss attended the course from 8:00 a.m.

26  to 5:00 p.m. each day and was provided two 15-minute rest breaks

27  and a 30-minute lunch break. Garrison Decl., Ex. A at 61:8-62:2.

28

1  At night, Plaintiff attended flight simulation exercises for

2  another 1.5-2.5 hours. DSUF ¶ 22; PSGI ¶ 22.

3     After completing the training course in Texas, Sarviss

4  returned to his home in California to await deployment to Pakistan.

5  Id. at ¶ 23. He waited there for approximately two weeks, during

6  which time he was not asked to work more than 8 hours per day or 40

7  hours per week and during which time he was not denied any meal or

8  rest periods. Id. at ¶¶ 23, 25, 26. While awaiting deployment in

9  California, Plaintiff received his base salary. DSUF ¶ 12; PSGI

10  ¶ 12. During that time, Sarviss spent time preparing for his

11  deployment and purchased supplies; the parties dispute whether

12  these activities were at Sarviss's "own initiative." Id. at ¶¶ 12,

13  24.

14     During the first week of June 2007, Sarviss deployed to

15  Pakistan, where he remained for around 90 days. Garrison Decl.,

16  Ex. A at 88:15-89:1. Sarviss described his "primary job" while in

17  Pakistan as "keep[ing] myself and my co-pilot alive because of

18  their lack of knowledge on how to operate an aircraft at night."

19  Garrison Decl., Ex. A at 92:6-8. The parties dispute the amount of

20  "teaching" or "training" Sarviss actually did while in Pakistan.

21  DSUF ¶ 29; PSGI ¶ 29. GDIT employee John Landis taught classes on

22  the ground. At the very least, however, Sarviss admits that he

23  "was the first person to come [to Pakistan] and within one week of

24  being [there] was actually training students and had met Lieutenant

25  Colonel Shahid's approval." Garrison Reply Decl., Ex. A (Sarviss

26  Depo.) at 51:6-10; see Garrison Decl., Ex. A (Sarviss Depo.) at

27  121:1-10; id. at 128; see also DSUFR at 29-31. During a training

28  flight, Sarviss typically would put NVGs on the trainee and give

him the controls to the helicopter.  Sarviss constantly monitored the helicopter's instruments, and took the controls away from the pilot if necessary.  Sarviss also checked to ensure that the pilot trainee was interpreting the terrain correctly through the NVG. DSUF ¶ 31; PSGI ¶ 31.  While in Pakistan, Sarviss instituted a rule with the trainees that a pilot should return the helicopter with 700 pounds of fuel remaining.  Garrison Decl., Ex. A at 149:21-150:7.  Sarviss was required to rely upon his thirty-plus years of military and civilian experience and training while flying with Pakistani trainees.  DSUF ¶ 36.  Sarviss also prepared instrument approaches for "divert" fields; located a survival escape and evasion area, and created and put into place a plan; and conducted approximately 10 "captain check rides," during which he would evaluate and certify a trainee as an aircraft commander.  DSUF ¶ 33.[4]  Sarviss claims the Pakistani Air Force made him the SIP for the entire squadron, but the parties dispute whether this was within the scope of his GDIT assignment.  DSUF ¶ 34; PSGI ¶ 34.

While in Pakistan, Sarviss frequently worked in excess of 8 hours per day and 40 hours per week.  In some weeks, he worked in excess of 70 or 80 hours per week.  DSUFR at 59-60.

On July 17, 2007, Sarviss tendered his resignation to GDIT. DSUF ¶ 37; PSGI ¶ 37.  In that letter, Sarviss stated that he "still ha[d] not been reimbursed for expenses incurred on your behalf over 60 days ago for several thousand dollars."  DSUFR at 67.  On or about August 7, 2007, Sarviss submitted an amended

---

[4]Plaintiff's relevancy objection is overruled.

1  resignation letter seeking to move his last day of employment to
2  September 4, 2007.  DSUF ¶ 37; PSGI ¶ 37.

3      During his employment with GDIT, GDIT paid Sarviss an annual
4  salary of $83,200.00, paid biweekly at $3,200.00 per pay period.
5  Id. at ¶ 39.  GDIT paid Sarviss his base salary while he attended
6  training in North Carolina and Texas and also while he was at home
7  in California waiting to deploy to Pakistan.  Id.  While working in
8  Pakistan, in addition to his base salary, GDIT paid Sarviss an
9  additional 25% of his base salary for "Danger Pay," an additional
10 20% "Hardship Differential," and a full $30,000 contractual
11 "completion" bonus.  Id. at ¶¶ 40-41.  Plaintiff's actual pay can
12 be summarized as follows: (1) $6,400 for the first four weeks; (2)
13 $27,840.00 for the 12 weeks in Pakistan; and (3) a $30,000.00
14 completion bonus.  Thompkins Decl. ¶ 11.

15     The GDIT "International Assignment Provisions for John D.
16 Sarviss" stated, under "Scheduled Hours," that the assignment was
17 "based on 40 hours per week."  Thompkins Decl., Ex. A at 9.[5]  It is
18 undisputed that Sarviss was not compensated for overtime he worked
19 or for missed meal and rest periods.  DSUFR at 60.

20 **B.   The Complaint**

21     Plaintiff's Complaint seeks to bring eight causes of action
22 against GDIT.[6]  The Complaint alleges one cause of action pursuant
23 to the federal Fair Labor Standards Act ("FLSA"), six causes of
24 action pursuant to the California Labor Code ("Labor Code"), and

25

26     [5]The Court notes that there are no breach of contract
27 allegations in the Complaint.

28     [6]The Complaint is attached as Exhibit A to Defendant's Notice
of Removal.  See Doc. No. 1 at 0011 (March 3, 2008).

one cause of action pursuant to California's unfair competition law, California Business and Professions Code § 17200 ("UCL").

In his FLSA claim, Plaintiff alleges that Defendant mis-classified Plaintiff as an exempt employee and failed to pay him overtime in violation of 29 U.S.C. § 207(a).  Compl. ¶¶ 54-59.

Plaintiff brings six claims under the California Labor Code. His First Claim for Relief alleges that GDIT improperly classified Plaintiff as "exempt" and, as a result, failed to pay overtime in violation of California Labor Code §§ 218 & 1194(a) and Industrial Welfare Commission ("IWC") Wage Order No. 4.  Compl. ¶¶ 35-49.  The Second Claim for Relief alleges that GDIT violated California Labor Code § 226 and IWC Wage Order No. 4 in failing to provide itemized wage statements showing total hours worked, the applicable hourly rates, and the legal name and address of the employer.  Compl. ¶¶ 50-53.  The Fourth and Fifth Claims for Relief allege that GDIT failed to provide Plaintiff with adequate meal periods and rest periods in violation of California Labor Code § 226.7 and IWC Wage Order No. 4.  Compl. ¶¶ 60-67.  Plaintiff's Sixth Claim for Relief alleges that GDIT failed to pay wages earned and unpaid promptly upon termination or resignation in violation of Labor Code §§ 201-202 and seeks continuing wages pursuant to section 203.  Compl. ¶¶ 68-71.  The Seventh Claim for Relief alleges that GDIT failed to reimburse Plaintiff for his expenditures in violation of California Labor Code § 2802.  Compl. ¶¶ 72-75.

Finally, the Eighth Claim for Relief alleges that GDIT's acts "constitute a continuing and ongoing unlawful activity prohibited by section 17200 *et seq.* of the California Business and Professions Code."  Compl. ¶ 76; see id. at 77-90.

**C.   Class and Collective Action Facts and Allegations**

Plaintiff seeks to bring this action as a representative action on behalf of himself and others similarly situated.  With respect to the California claims, Sarviss originally sought to bring his claims "on behalf of all residents of the State of California who, at any time during the four years preceding the filing of the Complaint through the filing of a motion for class certification, received a pay stub or wage statement from the Defendant or its predecessor in interest, Anteon International Corporation."  Compl. ¶¶ 5, 21.  With respect to the FLSA claim, Sarviss originally sought to bring the action as an opt-in collective action pursuant to 29 U.S.C. § 216(b) "on behalf of all persons who, at any time during the three years preceding the filing of this Complaint, were or have been employed as persons governed by Industrial Welfare Commission Wage Order No. 4-2001 regulating wages, hours and working conditions in the technical, clerical, mechanical and similar occupations by GDIT and who did not receive or have not received overtime compensation as required by federal law."  Compl. ¶¶ 5, 31.  As discussed below, Sarviss narrowed his certification requests in his Replies to GDIT's Oppositions to both certification motions.

**II.   MOTION FOR SUMMARY JUDGMENT**

First, the Court addresses GDIT's Motion for Summary Judgment.[7]  GDIT moves for summary judgment as to the entirety of

---

[7]A district court has discretion to rule on a motion for summary judgment before it decides certification issues, "[u]nder the proper circumstances."  Wright v. Schock, 742 F.2d 541, 543-44 (9th Cir. 1984).  Proper circumstances will exist when the court determines that "resolution of a motion for summary judgment seems

(continued...)

1  Plaintiff's Complaint, or, in the alternative, for partial summary

2  judgment.  GDIT argues that summary judgment must be entered in its

3  favor as to the FLSA claims both because the FLSA does not apply

4  and because Plaintiff was exempt from its requirements.  GDIT also

5  argues that summary judgment must be entered in its favor as to the

6  California claims both because California wage and hour law does

7  not apply and because Plaintiff was administratively exempt.

8      **A.   Legal Standard**

9      Summary judgment is appropriate where "the pleadings, the

10  discovery and disclosure materials on file, and any affidavits show

11  that there is no genuine issue as to any material fact and that the

12  movant is entitled to a judgment as a matter of law."

13  Fed. R. Civ. P. 56(c).  All reasonable inferences from the evidence

14  must be drawn in favor of the nonmoving party.  Anderson v. Liberty

15  Lobby, Inc., 477 U.S. 242, 255 (1986).  A genuine issue exists if

16  "the evidence is such that a reasonable jury could return a verdict

17  for the nonmoving party"; and material facts are those "that might

18  affect the outcome of the suit under the governing law."  Anderson,

19  477 U.S. at 248. A party opposing summary judgment must come

20  forward with specific facts, supported by admissible evidence,

21

22

23      [7](...continued)

24  likely to protect both the parties and the court from needless and
    costly further litigation."  Id. at 544.  Proper circumstances will

25  not exist, however, where the Court considers a "transitory claim
    that cries out for a ruling on certification as rapidly as

26  possible."  Wade v. Kirkland, 118 F.3d 667, 670 (9th Cir. 1997).
    Although Plaintiff has cited authority to the effect that a

27  certification order should not address the merits of a claim,
    Plaintiff has not suggested that it is inappropriate for the Court

28  to address the summary judgment motion before certification.  For
    the sake of judicial economy, then, it makes sense to do so here.

showing a genuine issue for trial. Fed. R. Civ. P. 56(e); <u>Brinson</u>
<u>v. Linda Rose Joint Venture</u>, 53 F.3d 1044, 1049 (9th Cir. 1995).

Summary judgment is warranted if a party "fails to make a
showing sufficient to establish the existence of an element
essential to that party's case, and on which that party will bear
the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S.
317, 322 (1986). No genuine issue of fact exists "[w]here the
record taken as a whole could not lead a rational trier of fact to
find for the non-moving party." <u>Matsushita Elec. Indus. Co. v.</u>
<u>Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

Plaintiff appears to agree that there are no genuine issues of
material fact underlying Defendant's legal arguments as to whether
the FLSA and/or California wage and hour law applies.  Plaintiff
does argue, however, that there are genuine issues of material fact
as to whether Plaintiff is exempt under either the FLSA or
California wage and hour law.

**B.   Discussion**

1.   <u>Plaintiff's FLSA Claims</u>

First, Defendant moves for summary judgment on Plaintiff's
FLSA claims.  The parties agree that the FLSA does not apply to
Plaintiff's service in Pakistan, which comprises the majority of
his employment with GDIT.  <u>See</u> 29 U.S.C. § 213(f) ("The provisions
of sections 206, 207, 211, and 212 of this title shall not apply
with respect to any employee whose services during the workweek are
performed in a workplace within a foreign country[.]").  The FLSA
therefore indisputably does not provide a basis for overtime pay
while Sarviss was in Pakistan.  Accordingly, the only question is
whether Plaintiff can succeed on his FLSA claims for the time he

1  spent in training in North Carolina and Texas.  Defendant argues

2  that summary judgment should be granted in its favor for two

3  independent reasons: (1) Plaintiff falls under the FLSA's "highly

4  paid employee" exemption and (2) Plaintiff falls under the FLSA's

5  administrative exemption.  An employer has the burden of proof to

6  establish the applicability of an exemption under the FLSA.

7  Corning Glass Works v. Brennan, 417 U.S 188, 196-97 (1974).

8  Accordingly, to succeed on summary judgment here, GDIT must

9  establish the absence of a genuine issue of material fact as to

10  each element of the relevant exemption.  Additionally, GDIT must

11  satisfy this burden against the legal backdrop that "[w]hether

12  employees are exempt from the requirements of the FLSA is primarily

13  a question of fact."  Nigg v. U.S. Postal Serv., 555 F.3d 781, 788

14  (9th Cir. 2007) (internal quotation marks and brackets omitted).

15          a.  The "Highly Paid Employee" Exemption

16      First, GDIT argues that Sarviss falls under the "highly

17  employee" exemption from the FLSA.  Because "[a] high level of

18  compensation is a strong indicator of an employee's exempt status,"

19  under the FLSA high compensation "eliminat[es] the need for a

20  detailed analysis of the employee's job duties."  29 C.F.R.

21  § 541.601(c).  To fall within this exemption (the requirements of

22  which the parties do not dispute), an employee must (1) have a

23  "total annual compensation of at least 100,000," id. § 541.601(a);

24  (2) "customarily and regularly perform[] any one or more of the

25  exempt duties or responsibilities of an executive, administrative,

26  or professional employee," id.; and (3) have included in his

27  primary duty "perform[ing] office or non-manual work," id.

28  § 541.601(d).  The parties also do not appear to dispute that,

1   although the FLSA does not apply to Plaintiff's service while he

2   was in Pakistan, the applicability of an exemption turns on the

3   duties of the entire job.  In sum, the parties do not dispute the

4   FLSA law so much as the extent to which the facts implicate it.[8]

5                       i.   Total Annual Compensation of At Least

6                       $100,000

7        To qualify for the exemption, an employee must make at least

8   $100,000 in total annual compensation.  "Total annual compensation"

9   may include "commissions, nondiscretionary bonuses and other

10  nondiscretionary compensation earned during a 52-week period," but

11  does not include board, lodging, payments for medical insurance and

12  life insurance, contributions to retirement plans, or the cost of

13  other fringe benefits.  29 C.F.R. § 541.601(b)(1).  For an employee

14  who does not work a full year for the employer, the employee may

15  qualify for the exemption if the employee "receives a pro rata

16  portion" of $100,000 "based upon the number of weeks that employee

17  will be or has been employed."  29 C.F.R. § 541.601(c)(3).

18  Additionally, an employee must receive "at least $455 per week paid

19  on a salary or fee basis."  Id. § 541.601(b).

20       GDIT has met its burden to show that Sarviss qualifies for

21  this first element of the exemption using the pro rata approach,

22  and Sarviss has not shown that there are genuine issues of material

23  fact as to that prong.  Even excluding the $30,000 completion

24  bonus, Sarviss's average weekly salary would have led to an annual

25  compensation of $111,280.00.  See Thompkins Decl. ¶ 11; Def.'s Mem.

26  _____

27       [8]Plaintiff argues that GDIT conflates various prongs of these
    tests.  The Court disagrees with that characterization of
28  Defendant's argument.  Rather, Defendant argues that the same facts
    satisfy different prongs of the relevant exemptions.

1  at 10-11 & n.6; see 29 C.F.R. § 541.601(c)(3). In each week, his
2  salary exceeded $455.00.  Although Sarviss asserts in a footnote
3  that none of his salary was guaranteed, see Pl.'s Opp'n at 8 n.6,
4  he does not explain (through legal authority or otherwise) why the
5  pay he actually received and that formed the basis of GDIT's
6  calculation was in any way "discretionary."  Accordingly, the Court
7  finds that there is no genuine issue of material fact as to this
8  element.

9                    ii.   Customary and Regular Performance of One
10                          or More Exempt Duties

11      The second prong of the exemption requires an employee to
12  "customarily and regularly perform[] any one or more of the exempt
13  duties of an executive, administrative, or professional employee."
14  29 C.F.R. § 541.601(b).  The performance of an exempt duty will be
15  considered customary and regular where it occurs on a basis that is
16  "greater than occasional but which, of course, may be less than
17  constant.  Tasks or work performed 'customarily and regularly'
18  includes work normally and recurrently performed every workweek,"
19  as opposed to "isolated or one-time tasks."  29 C.F.R. § 541.701.
20  Here, GDIT asserts that Sarviss qualifies under this prong with
21  respect to the duties of either an administrative or a professional
22  employee.

23                    (A)   Administrative

24      An employee will fall under the administrative exemption if
25  the employee is one whose primary duty "is the performance of
26  office or non-manual work directly related to the management or
27  general business operations of the employer or the employer's
28  customers" and "includes the exercise of discretion and independent

judgment with respect to matters of significance."  29 C.F.R. § 541.200(a)(2)-(3).  For the purposes of the highly compensated employee exemption, the Court need only be satisfied that one of these prongs is met, and the Court need not engage in a detailed analysis of the other prong.  See Amendola v. Bristol-Myers Squibb Co., 558 F. Supp. 2d 459, 476-77, 478 (S.D.N.Y. 2008).

An employee meets the first requirement – the performance of "office or non-manual work directly related to the management or general business operations of the employer or the employer's customers" – where the employee "perform[s] work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment."  29 C.F.R. § 541.201(a).  Employees "acting as advisers or consultants to their employer's clients or customers" may satisfy this first prong.  Id. § 541.201(c).  The specific examples used by the regulation are those of business consultants.

An employee meets the second requirement when he exercises "discretion and independent judgment with respect to matters of significance."  The Department of Labor's regulations define the exercise of discretion and independent judgment in part as follows:

> In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered. The term "matters of significance" refers to the level of importance or consequence of the work performed. [¶] The phrase "discretion and independent judgment" must be applied in the light of all the facts involved in the particular employment situation in which the question arises. Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: whether the employee has authority to formulate, affect, interpret, or implement

15

1    management policies or operating practices; whether the
     employee carries out major assignments in conducting the
2    operations of the business; whether the employee performs work
     that affects business operations to a substantial degree, even
3    if the employee's assignments are related to operation of a
     particular segment of the business; whether the employee has
4    authority to commit the employer in matters that have
     significant financial impact; whether the employee has
5    authority to waive or deviate from established policies and
     procedures without prior approval; whether the employee has
6    authority to negotiate and bind the company on significant
     matters; whether the employee provides consultation or expert
7    advice to management; whether the employee is involved in
     planning long- or short-term business objectives; whether the
8    employee investigates and resolves matters of significance on
     behalf of management; and whether the employee represents the
9    company in handling complaints, arbitrating disputes or
     resolving grievances. [¶] [Additionally, t]he exercise of
10   discretion and independent judgment implies that the employee
     has authority to make an independent choice, free from
11   immediate direction or supervision.

12   29 C.F.R. § 541.202(a)-(c).

13        GDIT argues that Sarviss satisfied both of these prongs

14   because the nature of job required "customarily and regularly"

15   training Pakistani pilots.  With respect to the non-manual labor

16   prong, GDIT argues that Sarviss "act[ed] as an adviser to train

17   Pakistani Air Force pilots in night flight operations." See Def.'s

18   Mem. at 14.  Although the Court recognizes that employees who act

19   as advisers or consultants for customers may satisfy the non-manual

20   labor prong, the Court is not convinced that the nature of

21   Plaintiff's job places him into such a category.  As far as the

22   Court can tell, the examples in the regulations do not specifically

23   list training.  With respect to consulting performed for the

24   Pakistani commander, it appears that there is a genuine issue of

25   material fact as to whether this occurred during the course of

26   Plaintiff's employment.  See Sarviss Decl., Ex. 1 at 165-66.

27        Additionally, GDIT argues that Sarviss "customarily and

28   regularly" engaged in the exercise of discretion and independent

16

1  judgment with respect to matters of significance in training the

2  pilots.  GDIT supports its arguments with various portions of

3  Sarviss's deposition testimony that indicate, for example: (1) that

4  he worked with different students of different skill levels each

5  night, Garrison Decl., Ex. A at 120-21; (2) that he was "constantly

6  monitoring the instruments, taking the controls away from them[,]

7  . . . making sure that they are seeing what I'm seeing, that they

8  are interpreting the terrain correctly," id. at 155; (3) that he

9  instituted a rule requiring the return of a helicopter with 700

10  pounds of fuel, id. at 149-50; (4) that he did "captain check

11  rides" to evaluate and certify a trainee, id. at 147-48; and (5)

12  that he could not rely on Landis to deal with issues of inadequate

13  Pakistani skill level, id. at 129-30.  In a declaration in support

14  of his Opposition to this motion, Sarviss disputes whether he

15  actually did any training in how to fly helicopters because the

16  pilots were already experienced and the real "training" consisted

17  of reading materials and on-the-ground instruction, and suggests

18  that he was merely a co-pilot or crew member.  Sarviss Decl. ¶¶ 17,

19  19.[9]  Rather, Sarviss argues, his job duties "began and ended with

20  flying a helicopter on an as-needed basis" and that there is "no

21  evidence that his 'discretion' extended beyond the physical

22  operation of the helicopter."  Pl.'s Opp'n at 10:21-22, 14:2-3.

23  Additionally, Sarviss disputes the nature of certain of his more

24

25  ───────────────

26      [9]GDIT argues that the Court should disregard the Sarviss
   Declaration under the "sham declaration" rule.  To the extent
27  Sarviss flatly contradicts his deposition through his declaration,
   the Court disregards the declaration.  As a whole, however, the
28  Declaration does not clearly contradict his deposition testimony so
   much as it (arguably) clarifies what he meant.

1  discretionary tasks, asserting that they were outside of his GDIT
2  job duties.

3      Although the Court is inclined to find that Sarviss's
4  employment involved significant discretion and independent
5  judgment, the Court finds that the factual, factor-driven
6  "discretion and independent judgment" has not been indisputably
7  satisfied on this record.  To the extent that Sarviss argues he
8  provided no "training," the Court finds that his deposition
9  testimony flatly contradicts such a statement, and disregards the
10 paragraphs of his declaration that suggest otherwise.  However, the
11 Court finds that genuine issues remain as to whether his training
12 required discretion and independent judgment or rather the
13 application of highly technical training.  Accordingly, the Court
14 finds summary judgment inappropriate on this ground.

15                    (B)  Professional Exemption

16      Alternatively, GDIT argues that Sarviss performed one or more
17 duties that fall under the professional exemption.  An employee
18 will be deemed a professionally-exempted employee where the
19 employee's "primary duty is the performance of work" "[r]equiring
20 knowledge of an advanced type in a field of science or learning
21 customarily acquired by a prolonged course of specialized
22 intellectual instruction" or "[r]equiring invention, imagination,
23 originality or talent in a recognized field of artistic or creative
24 endeavor."  29 C.F.R. § 541.300(a)(2)(i)-(ii).  Under the "learned
25 professional" prong of the exemption, work is exempt where it (1)
26 requires advanced knowledge that is (2) in a field of science or
27 learning and (3) is customarily required by a prolonged course of
28 specialized intellectual instruction.  29 C.F.R. § 541.301(a).

Work requires advanced knowledge under the exemption if it is
"predominantly intellectual in character" and includes work
"requiring the consistent exercise of discretion and judgment, as
distinguished from performance of routine mental, manual,
mechanical or physical work," in that an employee will generally
use the advanced knowledge "to analyze, interpret or make
deductions from the varying facts or circumstances."  29 C.F.R.
§ 541.301(b).  Advanced knowledge is in a "field of science or
learning" when that field is traditional, "as distinguished from
the mechanical arts or skilled trades where in some instances the
knowledge is of a fairly advanced type, but is not in a field of
science or learning." Id. § 541.301(b).  Additionally, exempt work
is restricted to "professions where specialized academic training
is a prerequisite for the entrance into the profession," as opposed
to "occupations that customarily may be performed with only general
knowledge acquired by an academic degree in any field, with
knowledge acquired through an apprenticeship, or with training in
the performance of routine mental, manual, mechanical or physical
processes" or "occupations in which most employees have acquired
their skill by experience rather than by advanced specialized
intellectual instruction."  Id. § 541.301(c)-(d).

Separately, the exemption also applies to "any employee with
[(1)] a primary duty of teaching, tutoring, instructing or
lecturing in the activity of imparting knowledge and [(2)] who is
employed and engaged in this activity as a teacher in an
educational establishment by which the employee is employed."  29
C.F.R. § 541.303(a); see id. § 541.303(d) ("The requirements of
§ 541.300 . . . do not apply to the teaching professionals

19

described in this section."). Exempt teachers explicitly include "aircraft flight instructors." Id. § 541.303(b); see also Paul v. Petroleum Equip. Tools Co., 708 F.2d 168, 170 n.1 (5th Cir. 1983) (under prior regulations, aircraft flight instructor "expressly falls within the professional exemption for teachers").

GDIT argues in the alternative that Sarviss performed duties that fell under the learned professional prong or that Sarviss performed exempt duties under this exemption through his role as a helicopter flight instructor. There is no genuine issue as to whether Sarviss instructed the other pilots. While Sarviss attempts to claim that his job "began and ended with flying a helicopter on an as-needed basis," see Def.'s Opp'n at 12, his deposition testimony makes clear (and supports no reasonable inference to the contrary) that he understood his job to be training helicopter pilots when he signed his contract, and that he did in fact train and instruct the Pakistani pilots, though classroom instruction took place on the ground with Landis.[10] Additionally, it is undisputed that Sarviss was trained as an instructor pilot. DSUF ¶ 7; PSGI ¶ 7.

Generally, performing instruction is not sufficient to qualify for the teaching exemption because an employee must work at a formal educational institution. See Hashop v. Rockwell Space Operations Co., 867 F. Supp. 2d 1287, 1295 & n.4 (S.D. Tex. 1994) (under prior version of regulation,[11] shuttle simulator instructors

---

[10]To the extent Sarviss's declaration suggests the contrary, it conflicts with his deposition testimony and must not be considered.

[11]The prior version of this regulation is relevant for
(continued...)

20

1  do not fall under teacher exemption because they weren't associated

2  with educational establishment and were not certified).  Where the

3  highly paid employee exemption is at issue, however, an employee

4  need only perform "one or more" exempt duties.  By performing

5  helicopter and NVG instruction, Sarviss satisfies the "one or more"

6  requirement of the Highly-Paid Employee Exemption.

7                              iii. Primary Duty

8         Finally, the employee's "primary duty" must be the performance

9  of office or non-manual work.  Employees do not primarily perform

10  office or non-manual work when those employees are, for example,

11  "non-management production-line workers and non-management

12  employees in maintenance, construction and similar occupations such

13  as carpenters, electricians, mechanics, plumbers, iron workers,

14  craftsmen, operating engineers, longshoremen, construction workers,

15  laborers and other employees who perform work involving repetitive

16  operations with their hands, physical skill and energy."  29 C.F.R.

17  § 541.601(d).  Such employees "are not exempt under this section no

18  matter how highly paid they might be."  Id.  A "primary duty" is

19  "the principal, main, major or most important duty that the

20  employee performs," and should be determined on the basis of "all

21  the facts in a particular case, with the major emphasis on the

22  character of the employee's job as a whole."  Id. § 541.700(a).

23  Factors to consider

24

25  _____

26         [11](...continued)
    comparison as the 2004 editorial adjustments were "not intended to
27  cause any substantive changes" from prior version.  See Department
    of Labor, "Defining and Delimiting the Exemptions for Executive,
28  Administrative Professional, Outside Sales and Computer Employees,"
    68 Fed. Reg. 15560-01, 15568 (Department of Labor March 31, 2003).

include, but are not limited to the relative importance of the
exempt duties as compared with other types of duties; the
amount of time spent performing exempt work; the employee's
relative freedom from direct supervision; and the relationship
between the employee's salary and the wages paid to other
employees for the kind of nonexempt work performed by the
employee.

Id.

The Court finds that there are genuine issues of material fact
as to whether Plaintiff's "primary duty" involved "office or non-
manual work." Accordingly, the Court finds that summary judgment
on this prong – and therefore on the Highly Paid Employee Exemption
as a whole – is inappropriate.

                    b.    *Administrative Exemption*

Defendant alternatively argues that Plaintiff meets all of the
requirements of the administrative exemption. For the reasons
discussed above in subsection II(B)(1)(a)(ii)(A), genuine issues of
material fact remain and make summary judgment inappropriate.

         2.   Plaintiff's California Overtime and Meal and Rest
              Period Claims

With respect to Plaintiff's California overtime and meal and
rest period claims, Defendant moves for summary judgment on two
basic bases. First, GDIT argues that the California Labor Code
does not apply because the only services Plaintiff performed for
Defendant were performed entirely outside of California. According
to GDIT, both the presumption against the extraterritorial
application of California laws and the Dormant Commerce Clause
preclude the application of California law. Alternatively, GDIT
argues that the California administrative exemption applies. The
Court grants this portion of Defendant's Motion on the ground that

California wage and hour law does not apply to Sarviss where he was performing services outside of California.  Because Plaintiff does not seek compensation for overtime or missed meal and rest periods earned while he was in California, the Court grants summary judgment in favor of Defendant on the California overtime and meal and rest period claims.  This holding does not address Plaintiff's wage statement and reimbursement claims to the extent they arise from the time period where Plaintiff was in California awaiting deployment.

a.   *Applicability of California Labor Code*

GDIT moves for summary judgment on Plaintiff's California claims on the ground that California wage and hour law cannot apply to Plaintiff's time in North Carolina, Texas, or Pakistan, i.e., the large majority of his roughly four-month employment with GDIT. GDIT argues that the extraterritorial application of California wage and hour law is inappropriate here because there is no indication that the California legislature attempted to overcome the presumption against extraterritorial application.  Sarviss argues that the extraterritorial application of the law is unclear in his situation and that California's policy of construing wage and hour laws broadly in favor of the employee should tip the scale in favor of extraterritorial application for California residents.

Sarviss appears to argue in his Opposition that he "perform[ed] part of [his] work in California."  Pl.'s Opp'n at 21. His deposition makes apparent that he spent the time in California preparing for his trip by securing supplies.  See DSUF ¶ 24; PSGI ¶ 24.  The parties dispute whether this was part of his employment. PSGI ¶ 24; DRSUF at 25-26.  Again, however, it is undisputed that

1    Sarviss seeks overtime and payment for missed meal and rest periods

2    only incurred outside of California.  DSUF ¶¶ 25-26; PSGI ¶¶ 25-26.

3        California law contains a presumption against extraterritorial

4    application of remedial statutes.  As the California Supreme Court

5    has put it:

6        Although a state may have the power to legislate concerning
         the rights and obligations of its citizens with regard to
7        transactions occurring beyond its boundaries, the presumption
         is that it did not intend to give its statutes any
8        extraterritorial effect.  The intention to make the act
         operative, with respect to occurrences outside the state, will
9        not be declared to exist unless such intention is clearly
         expressed or reasonably to be inferred 'from the language of
10       the act or from its purpose, subject matter or history.'

11   North Alaska Salmon Co. v. Pillsbury, 174 Cal. 1, 4 (1916),

12   reaffirmed in Diamond Multimedia Sys., Inc. v. Superior Court, 19

13   Cal. 4th 1036, 1059 (1999).[12]

14       On the basis of the undisputed facts and the unclear law on

15   these issues, the Court finds (1) that the presumption against

16   extraterritorial application of California wage and hour law

17   applies here and (2) that Sarviss does not fall under the

18   presumptive application of the IWC wage orders reserved for

19   California "wage earners."  There is no "clear express[ion]" of

20   extraterritorial application for California wage and hour laws.

21   Although some provisions of the Labor Code appear to suggest that

22   the Industrial Wage Commission's orders extend only to employment

23   occurring in California, see Cal. Labor Code §§ 1173 & 1193.5 ("in

24   this state"), the Labor Code also more generally provides that the

25   Department of Industrial Relations is charged with "foster[ing],

26   ─────────────────

27       [12]Of course, even if the California legislature intends for a
     statute to have extraterritorial application, that application may
28   have limits imposed by the United States Constitution through, for
     example, the Supremacy Clause and/or the dormant Commerce Clause.

1   promot[ing], and develop[ing] the welfare of the wage earners of

2   California," id. § 50.5.  Even in light of this language, there is

3   nothing in the statutory scheme itself that "explicitly defines or

4   limits" the IWC's authority.  Tidewater Marine W., Inc. v.

5   Bradshaw, 14 Cal. 4th 557, 577 (1996).

6       The language of the wage orders and Labor Code sections leaves

7   the presumption against extraterritorial application unrebutted,

8   and the California Supreme Court has not decided whether the Labor

9   Code's language or purpose impliedly suggests an intent to apply

10  those laws to events occurring outside of California.  In

11  Tidewater, the California Supreme Court addressed whether

12  California wage and hour law applied to California residents

13  working in the Santa Barbara channel, including the issue of

14  whether the Santa Barbara channel was part of California.  It is

15  perhaps undisputed here that "California employment laws implicitly

16  extend to employment occurring within California's state law

17  boundaries."  14 Cal. 4th at 565.  With respect to employment

18  outside the state's territorial boundaries, the Tidewater court

19  first pointed to worker's compensation statutes in noting that

20  "[i]n some circumstances state employment law explicitly governs

21  employment outside the state's territorial boundaries."  Id. at

22  577.[13]  Distinguishing explicit statutory language in the workmen's

23  compensation scheme from the language in the IWC wage orders, the

24  court left open room for statutory intent to be clarified:

25  _____

26      [13]E.g., Cal. Labor Code § 3600.5(a) ("If an employee who has
    been hired or is regularly employed in the state receives personal
27  injury by accident arising out of and in the course of such
    employment outside of this state, he, or his dependents, in the
28  case of his death, shall be entitled to compensation according to
    the law of this state.").

> The Legislature may have similarly intended extraterritorial enforcement of IWC wage orders in limited circumstances, such as when California residents working for a California employer travel temporarily outside the state during the course of the normal workday but return to California at the end of the day. On the other hand, the Legislature may not have intended IWC wage orders to govern out-of-state businesses employing nonresidents, though the nonresident employees enter California temporarily during the course of the workday.

Id. at 577-78.  Overall, the court noted that it was "not prepared, without more thorough briefing of the issues, to hold that IWC wage orders apply to all employment in California, and never to employment outside California."  Id. at 578.  Likewise, the court "express[ed] no opinion as to whether the trial court can enjoin the application of IWC wage orders to crew members who work primarily outside California's state law boundaries[.]" Id. at 579.[14]

Though the Tidewater court suggested that there was nothing to overcome the presumption against extraterritorial application in the text and declined to directly address the issue, the court *did* explain that IWC wage orders presumptively *apply* to California wage earners.  That is, though it did not decide the potential extraterritorial application of the IWC wage orders, the Tidewater court *did* find "California's territorial boundaries . . . relevant to determining whether IWC wage orders apply."  Id. at 578.  The court explained a potentially competing presumption: "[i]f an employee resides in California, receives pay in California, and

---

[14]Following Tidewater, there has been legislative silence on the issue of whether, how, or in what circumstances the IWC Wage Orders apply extraterritorially.  On this point, the court finds the reasoning of the California Court of Appeal's unpublished decision in Guy v. IASCO, 2004 WL 1354300 (Cal. Ct. App. June 17, 2004), persuasive, even though that decision is not precedential.

works exclusively, or principally, in California, then that employee is a 'wage earner of California' and presumptively enjoys the protection of IWC regulations." Id. at 578.  The court then cited United Air Lines, Inc. v. Industrial Welfare Com., 211 Cal. App. 2d 729, 735, 748-749 (1963), describing that case as "assum[ing] that IWC regulations apply to persons who are domiciled in California but work principally outside the state." Tidewater, 14 Cal. 4th at 578.[15]  Because the Tidewater court found that the employees "reside[d] in California, receive[d] pay in California, and work[ed] in California," the court found that they were "wage earners of California" who "presumptively enjoy[ed] the protections of IWC wage orders." Id. at 578-79.

Sarviss does not clearly fall into this "wage earner of California" presumption.  Unlike in Tidewater, the three elements that would entitle Sarviss to presumptive application of the wage orders are not met here: although it is undisputed that he is a California resident who presumably received his pay in California (as he paid California taxes), he performed the significant majority of his employment outside of California.  That is, it is undisputed that Sarviss did the work he was contracted to do, and spent between eighty and ninety percent of his roughly 16 working weeks, outside of California.  Indeed, this case is also not one for which the Tidewater court particularly contemplated extraterritorial application.  See Tidewater, 14 Cal. 4th at 577-78.  Rather, this case appears to fall between the two Tidewater

---

[15]United Air Lines found that California law did not apply because its application to flight attendants who worked almost entirely interstate would violate the dormant commerce clause.

presumptions – the presumption against application to events occurring outside of California, on the one hand, and the presumption that wage earners of California do fall under the purview of the IWC wage orders.  Put simply, the law is unclear on this issue.[16]

In Guy, the California Court of Appeal faced similar facts: one plaintiff was a resident of California but performed more than ninety percent of his work outside of California.  2004 WL 1354300 at *4.  The court noted that the Tidewater court had expressly not addressed the applicability of the wage orders to a California resident who performed most of his work outside the state.  Id. (citing Tidewater, 14 Cal. 4th at 579).  Likewise, the Guy court avoided the "tough" issue by finding the application of the IWC wage order to that California resident barred by the dormant commerce clause.  Id. at *4, *6-7.

The Court finds that the IWC wage orders do not apply to Sarviss in this case, even though he is a California resident.  Rather, on the Court's reading of the jurisprudence, the determinative issue is whether an employee principally works in California.  Although the cases discussing the extraterritorial application of California's wage and hour law are sparse, those decisions that do discuss it have tended to find that California wage and hour provisions do not apply to non-resident Californians who work primarily outside of California.  See Priyanto v. M/S Amsterdam, et al., 2009 WL 175739 (C.D. Cal. January 23, 2009)

---

[16]Despite Plaintiff's assertion to the contrary, unclear law is not a "genuine issue of material fact" that would preclude summary judgment.

(Matz, J.); <u>Tidenberg v. Bidz.com</u>, 2009 WL 605249 (C.D. Cal. March 4, 2009) (Gutierrez, J.).  Plaintiff emphasizes resident status as reason enough why those cases are distinct.  Based on the Court's reading of the jurisprudence, however, the Court finds Judge Matz's approach, which focuses on *situs* of the employee's work, to be persuasive.  <u>Priyanto</u>, 2009 WL 175739 at *6-*8.  Although California will still have an interest in the working conditions of its residents, that interest is perhaps weaker where the individual neither "works exclusively, [nor] principally, in California."  <u>See</u> <u>Tidewater</u>, 14 Cal. 4th at 558.  The focus on situs of employment as opposed to residence of the employee or the employer is consistent with the decisions of California state courts and from courts in jurisdictions outside of California.  <u>See, e.g.</u>, <u>Guillory v. Princess Cruise Lines, Ltd.</u>, 2007 WL 102851 (Cal. Ct. App. 2007) (unpublished); <u>Peikin v. Kimmel & Silverman, P.C.</u>, 576 F. Supp. 2d 654, 657 (D.N.J. 2008); <u>see also</u> <u>Priyanto</u>, 2009 WL 175739 at *7-*8 (citing cases).

   <u>Tidewater</u>'s citation to <u>United Air Lines, Inc. v. IWC</u>, 211 Cal. App. 2d 729 (1963), does not change this analysis.  As mentioned above, after noting that a wage earner is presumptively entitled to the protection of IWC Wage Orders, the <u>Tidewater</u> court used a "Cf." cite to <u>United Air Lines</u>, and parenthetically described that case as "assum[ing] that IWC regulations apply to persons who are domiciled in California but work principally outside the state."  <u>Tidewater</u>, 14 Cal. 4th at 578.  The Court does not read this fleeting citation to suggest that the IWC wage orders presumptively apply to California residents primarily or exclusively working elsewhere.  The context makes unclear whether

the <u>Tidewater</u> court approved of the "assumption," but at least two facts suggest it did not: <u>Tidewater</u> expressly used a three-element definition of "wage earner" and <u>Tidewater</u> expressly left this precise issue open.  Moreover, the Court notes that <u>United Air Lines</u> found such an application to be in violation of the dormant commerce clause.

In sum, because Sarviss indisputably spent the vast majority of his employment working *outside* of California – and, in fact, *relocated* to different states and a foreign country while outside of California[17] – the Court finds that the IWC wage order does not presumptively apply to that employment and that the presumption against extraterritorial application of the wage orders has been left unrebutted.

Two additional issues further convince the Court that this holding is the appropriate one.  First, in light of GDIT's dormant commerce clause argument, the principles that favor the avoidance of constitutional issues support this holding.  The doctrine of constitutional avoidance counsels that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress."  <u>Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council</u>, 485 U.S. 568, 575 (1988).  A court should invoke the doctrine only if it has "grave doubts about the constitutionality of [an application]."  <u>Ileto v. Glock</u>, 565

---

[17]As opposed to "travel[ing] temporarily outside the state during the course of the normal workday but return[ing] to California at the end of the day."  <u>Tidewater</u>, 14 Cal. 4th at 577-78.

F.3d 1126, 1143 (9th Cir. 2009).  As defendants have cited at least two cases where courts have found a violation of the dormant commerce clause through the extraterritorial application of IWC wage orders in comparable situations, the Court notes that the Court's interpretation avoids the potential dormant commerce clause issues that may arise from the application of California wage and hour law to a job that was performed almost entirely outside of California with team members from various states.  Second, and relatedly, the Court notes that the majority of Sarviss's service for GDIT took place not only outside of California, but in a foreign country, working alongside individuals from various states.

In addition, the Court is not convinced that the state policy in favor of the broad application of wage and hour law tips the result in favor of Sarviss here.  Because he is a resident and because California law is unclear on whether the law applies extraterritorially, Sarviss argues, public policy that favors the broad application of wage and hour law should tip the balance against summary judgment.  In light of the presumption against extraterritorial application, however, a lack of clarity in the law should side with that presumption.  Additionally, it is not clear that broad policy goes to extraterritorial application of those laws at all, as opposed to construction of the law once it clearly applies. See Murphy v. Kenneth Cole Prods., Inc., 40 Cal. 4th 1094, 1103 (2007).  Plaintiff has cited no case to the former effect, and the Court has not independently found one.

Again, Sarviss does not claim overtime or missed meal and rest periods for any of the time employed by GDIT where he was located in California.  Because California law does not apply to Sarviss's

1  claims for overtime and missed meal and rest periods, the Court

2  grants summary judgment in favor of GDIT on those claims to the

3  extent he brings them under California law.

4          3.   California Labor Code § 2802

5      GDIT also moves for summary judgment on Plaintiff's California

6  Labor Code § 2802 claim.  Pursuant to California Labor Code § 2802,

7  an employer must reimburse an employee "for all necessary

8  expenditures or losses incurred by the employee in direct

9  consequence of the discharge of his or her duties."  Cal. Labor

10  Code § 2802(a).  There is a genuine issue of material fact as to

11  whether the items purchased while he was in California waiting for

12  deployment to Pakistan were purchased at the direction of his

13  employer.  DSUF ¶ 24; PSGI ¶ 24.[18]  Accordingly, the Court denies

14  that portion of Defendant's Motion.

15      **C.   Conclusion**

16      For the foregoing reasons, the Court denies GDIT's Motion for

17  Summary Judgment on the FLSA claims, grants GDIT's Motion with

18  respect to the California overtime and meal and rest period claims,

19  and denies the Motion with respect to the remaining Labor Code

20  claims.

21  **III. MOTION FOR CERTIFICATION OF COLLECTIVE ACTION (FLSA)**

22      Sarviss moves for certification of a collective action with

23  respect to the Third Cause of Action, which alleges a violation of

24  the FLSA, 29 U.S.C. § 216(b).  Plaintiff initially sought

25  certification of an "opt-in" class consisting of:

26

27  _____

28      [18]Sarviss's use of the word "initiative" in his deposition is
not dispositive of this issue.

> all natural persons who, at any time during the period from
> three years prior to the filing of this Complaint to the date
> of the filing of a motion for certification of a collective
> action, were or have been employed as persons governed by
> Industrial Welfare Commission Wage Order No. 4-2001 regulating
> wages, hours, and working conditions in the technical,
> clerical, mechanical, and similar occupations by Defendant and
> who did not receive or have not received overtime compensation
> as required by federal law.

See Pl.'s Mot. Cert. Collective Action ("Pl.'s Coll. Action Mot.")

at 2.   In his Reply, however, Plaintiff modified his request to a

collective action class defined as:

> all natural persons, who, at any time during the period from
> three years prior to the filing of this Complaint to the date
> of filing of a motion for certification of a collective
> action, were or have been employed as GDIT helicopter pilots.

Pl.'s Coll. Action Reply at 1:13-26.   Although GDIT did not have

the opportunity to address this narrowed class definition in its

papers, GDIT addressed it at length during oral argument.

**A.   Legal Framework**

Section 207 of Title 29 of the Unites States Code requires

that employers pay non-exempt employees overtime.   29 U.S.C.

§ 207(a).   Pursuant to § 216(b), an action to recover for failure

to make overtime payments "may be maintained against any employer

. . . by any one or more employees for and in behalf of himself or

themselves and other employees similarly situated."   29 U.S.C.

§ 216(b).   Only employees who give their consent in writing – or

"opt in" – will be represented parties.   Id.   This form of

representative action is commonly referred to as a "collective

action."   "Because non-parties to a collective action are not

subject to claim preclusion, giving notice to potential plaintiffs

of a collective action has less to do with the due process rights

1   of the potential plaintiffs and more to do with the named

2   plaintiffs' interest in vigorously pursuing the litigation and the

3   district court's interest in 'managing collective actions in an

4   orderly fashion.'" McElmurry v. U.S. Bank Nat'l Ass'n, 495 F.3d

5   1136, 1139 (9th Cir. 2007).  District courts have considerable

6   discretion in managing FLSA collective actions, including in

7   determining how and when notice is provided to potential opt-in

8   class members, see Hoffman-La Roche Inc. v. Sperling, 493 U.S. 165,

9   171-73 (1989), and whether certification of a § 216(b) collective

10  action is appropriate, Leuthold, 224 F.R.D. at 466.

11       **B.   Discussion**

12            1.   Applicable Standard

13       The parties first dispute the standard that should apply to

14  certification of a collective action here.  Section 216(b) provides

15  that a collective action may be maintained where the claimants are

16  "similarly situated."  The statute does not define the term

17  "similarly situated," and as far as the Court can tell, both the

18  Supreme Court and the Ninth Circuit have yet to interpret the

19  phrase.  Although courts have taken a few different approaches to

20  certification of a collective action, see generally 7B Charles Alan

21  Wright, Arthur R. Miller & Mary Kay Kane, Fed. Prac. & Proc.

22  § 1807, most courts interpreting § 216(b), including those in the

23  Ninth Circuit and in California, have adopted a two-step approach.

24  See, e.g., Wynn v. Nat'l Broad. Co., Inc., 234 F. Supp. 2d 1067,

25  1082 (C.D. Cal. 2002); Leuthold v. Destination America, Inc., 224

26  F.R.D. 462, 466-67 (N.D. Cal. 2004); see also Newberg on Class

27  Actions § 24:3 (4th ed. 2008) ("Most courts have interpreted §

28  216(b) as requiring an analysis of whether plaintiffs are

34

1 'similarly situated' at two stages in the litigation: when notice
2 to prospective class members is initially sought and then following
3 discovery."); 7B Wright, Miller & Kane § 1087.

4     At the first stage, the court considers whether to certify a
5 collective action and permit notice to be distributed to putative
6 class members. See Thiessen v. Gen. Elec. Capital Corp., 267 F.3d
7 1095, 1102 (10th Cir. 2001). Courts making a notice-stage
8 determination tend to require "nothing more than substantial
9 allegations that the putative class members were together the
10 victims of a single decision, policy, or plan." Id. (internal
11 quotation marks omitted). A plaintiff "need not show that his
12 position is or was identical to the putative class members'
13 positions; a class may be certified under the FLSA if the named
14 plaintiff can show that his position was or is similar to those of
15 the absent members." Freeman v. Wal-Mart Stores, Inc., 256 F.
16 Supp. 2d 941, 945 (W.D. Ark. 2003) (emphasis added). "While the
17 standard for conditional approval at the stage of the litigation is
18 lenient, it does require some evidentiary support. The lack of any
19 evidence of similarity or even other potential class members
20 precludes class certification." Bishop v. Petro-Chemical Transp.,
21 LLC, 582 F. Supp. 2d 1290, 1296 (E.D. Cal. 2008); see Bernard v.
22 Household Intern., Inc., 231 F. Supp. 2d 433, 435 (E.D. Va. 2005)
23 ("Mere allegations will not suffice; some factual evidence is
24 necessary."); Freeman, 256 F. Supp. 2d at 945; Grayson v. K Mart
25 Corp., 79 F.3d 1086, 1097 (11th Cir. 1996) (plaintiffs may meet
26 their burden "by making substantial allegations of class-wide
27 [violations], that is, detailed allegations supported by affidavits
28 which successfully engaged defendants' affidavits to the contrary"

1  (internal quotation marks omitted)).  Plaintiffs will be deemed

2  similarly situated "when there is a demonstrated similarity among

3  the individual situations[-]some factual nexus which binds the

4  named plaintiffs and the potential class members together as

5  victims of a particular alleged" policy or practice.  Bonilla v.

6  Las Vegas Cigar Co., 61 F. Supp. 2d 1129, 1138-39 n.6 (D. Nev.

7  1999) (internal quotation marks omitted).

8      The second stage often occurs at the conclusion of discovery.

9  At that stage, courts use a stricter standard of "similarly

10  situated" by reviewing several factors, including (1) disparate

11  factual and employment settings of the individual plaintiffs; (2)

12  the various defenses available to the defendant which appear to be

13  individual to each plaintiff; and (3) fairness and procedural

14  considerations.  Leuthold, 224 F.R.D. at 467.  Where significant

15  discovery has been completed at the time of class certification,

16  "some courts have skipped the first-step analysis and proceeded

17  directly to the second step."  See Lockhart v. County of Los

18  Angeles, 2008 WL 2757080, Case No. CV 07-1680 ABC (PJWx), *4 (C.D.

19  Cal. 2008) (collecting cases); Pfohl v. Farmers Ins. Group, 2004 WL

20  554834, Case No. CV 03-3080 DT (RCx), *2-3 (C.D. Cal. 2004).  Those

21  courts have relied in part on the degree of discovery, including,

22  for example, whether discovery as to class issues had been

23  completed and whether discovery as to the existence of a

24  corporation-wide policy had been conducted.  See Smith v. T-Mobile,

25  2007 WL 2385131, Case No. CV 05-5274 ABC (SSx), *4 (C.D. Cal.

26  2007).

27      Defendant argues that, because the parties have engaged in

28  class-related discovery during the more than one year since this

36

action has been filed, see Garrison Decl. ¶¶ 4-7, the Court should proceed directly to the heightened second step in assessing whether Sarviss has met his burden to show that certification is proper. In particular, GDIT notes that Sarviss did not seek to take depositions prior to the filing of his collective action certification motion, thousands of documents were produced through discovery, and no motions to compel were filed. Id. Sarviss notes that GDIT refused to produce much of the information it now claims is lacking from Plaintiff's motion, see Harris Decl. in Supp. of Reply, ¶ 3 & Ex. 2, and contends that GDIT should not be allowed to benefit from its refusal to provide such information, Pl.'s Reply Coll. Action at 3-4.

The Court will apply the two-tiered approach here, with some hesitation and with some modification.  Although the lengthy time period for class discovery has closed, the Court generally will not allow a party to refuse discovery of certain issues and then use his opponent's lack of information on those particular issues as a central basis for proceeding with these issues.[19]  Nevertheless, two issues provide the Court some pause.  First, this is not a case where a plaintiff seeks certification within the first few months – or even within the first *year* – after a case has been filed.  The Scheduling Order contemplates the potential for class-related

---

[19]Plaintiff has pointed to a number of responses to interrogatories that reflect a refusal by GDIT to provide certain information it deemed outside the scope of class discovery.  While some of GDIT's objections on such a ground may have been well-taken, e.g., Harris Decl., Ex. 2 at 5, 10, 13-18 (Interrogatories 2, 6, 8-13), other requests clearly sought class-discovery-specific information that GDIT now claims is missing, see id. at 19-22 (Interrogatories 15-20).  Granted, there may have been other valid objections to those interrogatories.

discovery prior to the filing of such a motion, and all indications
are that the parties engaged in significant discovery.  In such a
context, the Court would expect the plaintiff to have access to
*some* additional evidence to support his contentions – declarations,
documents, or testimony.  Second, although Sarviss cites to GDIT's
responses to interrogatories, see Note 15, supra, Sarviss does not
explain why he noticed no depositions or why documents produced
through discovery were insufficient to address his concerns.  The
Court notes that the date on GDIT's responses to Plaintiff's
interrogatories is November 20, 2008, which left Plaintiff with
three months to seek additional information, reframe his requests,
file a motion to compel prior to the original deadline for filing
the instant motion, or seek an extension of the deadline.  Harris
Decl., Ex. 2 at 23-25.

In these circumstances, the Court does not find it appropriate
to move directly to the second step and consider those factors in
depth.  That said, however, the Court will hold Plaintiff to the
requirement that he put forth some evidence of similarity with
potential class members and the existence of other potential class
members.  In other words, applying the two-tiered analysis does not
exempt Sarviss from putting forth *some* evidence that there are
other individuals who may be or have been similarly situated.  This
is especially the case here, where the class discovery period was
specifically aimed at putting the parties in a position to
meaningfully address class discovery.

> 2.   Plaintiff Has Not Met His Burden

1    Even considering Plaintiff's narrowed collective action class
2    against the low standard imposed by conditional certification, the
3    Court finds Plaintiff's showing insufficient.

4    The Complaint alleges that GDIT improperly classified Sarviss
5    and the putative class members as "exempt" and did not pay them
6    overtime when they were frequently required to work over forty
7    hours per week.  Compl. ¶¶ 56-57.  Plaintiff's narrowed definition
8    of the putative opt-in class makes it plausible that, like him,
9    other helicopter pilots were classified as exempt for similar
10   reasons (and therefore their claims will be subject to similar
11   defenses), and fell within the same department as Sarviss.  See
12   Def.'s Opp'n Coll. Action at 2-6.  That said, allegations showing a
13   plausible theory are not enough here.

14   In support of certification, Plaintiff submits evidence in the
15   form of his own declaration that his experience working with other
16   GDIT employees was that they worked more than eight hours per day
17   and more than forty hours per week.  Sarviss Decl. ¶¶ 4-5.  To the
18   extent these points are based on personal observation, the Court
19   finds this evidence supportive of Plaintiff's motion.

20   Plaintiff's general statement about his observation of other
21   GDIT "employees" does not get him far enough, however.  Although
22   Plaintiff has narrowed his class definition to other helicopter
23   pilots, his declaration only addresses his experience and that he
24   observed other "employees."  His declaration does not suggest the
25   specific context in which he observed other employees – i.e., in
26   training or in Pakistan – and does not specify who those employees
27   were or what positions they held.  He has not provided evidence –
28   including through his own declaration – that would support the

existence of other helicopter pilots who deserved but were not paid

overtime or who, by Plaintiff's observation, were employed in a

similar role.[20]  His declaration does not provide a *single* example

aside from his own experience.  Aside from his own declaration,

Plaintiff has provided no additional evidence to support his claim

that he is similarly situated (declarations from fellow pilots, for

example), and the allegations in his Complaint are vague enough

that they could be considered "substantial" only on a particularly

generous reading.  With multiple months to conduct class discovery,

the Court cannot find this single, vague, general declaration

sufficient to satisfy even the lower threshold of the first step of

the analysis.  The Court is mindful of Plaintiff's complaints as to

the responses provided by GDIT in discovery, but the Court notes

that Plaintiff had numerous mechanisms at his disposal to marshal

sufficient information to satisfy his burden to show that there are

others similarly situated to him and that they were subject to a

common policy.

---

[20]Evidence submitted in support of Defendant's Motion for Summary Judgment supports the existence of other helicopter pilots that worked with Mr. Sarviss as helicopter pilots in Pakistan. Thompkins Decl. ¶¶ 5, 9.  (Though Plaintiff did not cite to this evidence – indeed, it was submitted *after* he filed his motion for class certification – he mentioned the other helicopter pilots at oral argument.)  That evidence is not sufficient to establish the existence of a "similarly situated" class, however, because it does not address pilots who allegedly deserved overtime because of their work *in the United States*.  Rather, it addresses pilots who worked in Pakistan but were from the United States.  As the Court discussed in reference to Defendant's Motion for Summary Judgment, the FLSA does not apply to time worked overseas.  Where Plaintiff has submitted no testimony specific to helicopter pilots and conclusory argument, the Court will not make inferential leaps to help him satisfy his burden. Additionally, the Court notes that while at oral argument Plaintiff sought to rely on Defendant's summary judgment evidence to support his certification motion, Plaintiff had objected to the use of this evidence in the Summary Judgment context.  <u>See</u> PSGI ¶¶ 16, 27.

C.   **Conclusion**

For the foregoing reasons, the Court denies the Motion for Certification of Collective Action.  The Court does not hold that Plaintiff could not satisfy his burden under any showing, but merely that he has not done so here.

## IV.   MOTION FOR CLASS CERTIFICATION (CALIFORNIA CLAIMS)

Plaintiff also moves for certification of a class action for two of the remaining California claims – those for improper wage statements and continuing wages – pursuant to Federal Rule of Civil Procedure 23.  Sarviss initially sought to certify a class for the purposes of *all* California claims asserted in the Complaint.  He defined the class as follows:

> all residents of the State of California who, at any time during the four years preceding the filing of the Complaint through the filing of a motion for class certification, received a pay stub or wage statement from the Defendant or its predecessor in interest, Anteon International Corporation.

Compl. ¶¶ 5, 21; Mot. Class Cert. at 1.  In his Reply, however, Sarviss narrowed the proposed class to (1) a proposed Wage Statement Class based on the above class definition, and apparently limited to an allegation that the wage statements did not identify the name and address of the employer in the manner required by California Labor Code § 226[21] and (2) a Final Wage Subclass, which

---

[21]In addition to narrowing the claims for which he seeks certification to the Second and Sixth, it appears that Plaintiff has further narrowed the claims within the Second Cause of Action. In particular, it appears that Plaintiff has abandoned a request for certification with respect to (1) all wage statement issues *except* the legal name and address of the employer and (2) IWC Wage Order No. 4.  Compare Compl. ¶ 52 (alleging broader violation, including by not showing itemized hours, and alleging a violation of both § 226 and IWC Wage Order No. 4), with Reply at 1 (limiting claim for certification to "identif[ication of] 'the name and address of the legal entity that is the employer'" under § 226).

1   includes "only those who are no longer employed by GDIT."  Because

2   Plaintiff's certification request initially included all of

3   Plaintiff's California claims, Defendant's Opposition primarily

4   addresses the class as initially framed.  At oral argument,

5   however, Defendant addressed the certification issues raised in

6   Plaintiff's Reply at length.[22]

7   **A.   Legal Standard**

8        Pursuant to Federal Rule of Civil Procedure 23, a party

9   seeking class certification must demonstrate that he has met each

10  of the four requirements of Rule 23(a) and at least one of the

11  requirements of Rule 23(b).  Lozano v. AT&T Wireless Servs., Inc.,

12  504 F.3d 718, 724 (9th Cir. 2007).  Rule 23(a) sets out four

13  prerequisites for a class action.  Even if those prerequisites are

14  satisfied, the party moving to certify must show that action falls

15  into one of the "Types of Class Actions" maintainable, listed in

16  subsection (b).[23]  In assessing a motion for certification, the

17  court should engage in a "rigorous analysis."  See Gen. Tel. Co. v.

18  Falcon, 457 U.S. 147, 161 (1982).

19       Although "the class determination generally involves

20  considerations that are enmeshed in the factual and legal issues

21  comprising the plaintiff's cause of action," Coopers & Lybrand v.

22  _____

23       [22]Prior to oral argument, Defendant had not requested an
    opportunity to file a Sur-Reply.

24       [23]Although Plaintiff purports to seek certification under all
25  three paragraphs of Rule 23(b), the parties' arguments primarily
    address a (b)(3) action, which is typical for a class action
26  seeking damages.  Because the Complaint and arguments by Sarviss
    make clear that the money damages claim is not "secondary to [a]
27  primary claim for injunctive or declaratory relief," the Court
    finds a (b)(2) class inappropriate and only addresses certification
28  under (b)(3).  Molski v. Gleich, 318 U.S. 937, 947 (9th Cir. 2003).
    Sarviss does not respond to GDIT's challenge on this ground.

1  <u>Livesay</u>, 437 U.S. 463, 469 (1978), a court's review of the merits

2  should be limited to those aspects relevant to making the

3  certification decision on an informed basis.  Fed. R. Civ. P. 23,

4  Advisory Committee Notes, 2003 Amdts.; <u>see also</u> <u>Blackie v. Barrack</u>,

5  524 F.2d 891, 901 n.17 (9th Cir. 1975)("The court is bound to take

6  the substantive allegations of the complaint as true, thus

7  necessarily making the class order speculative in the sense that

8  the plaintiff may be altogether unable to prove his allegations.

9  While the court may not put the plaintiff to preliminary proof of

10  his claim, it does require sufficient information to form a

11  reasonable judgment. Lacking that, the court may request the

12  parties to supplement the pleadings with sufficient material to

13  allow an informed judgment on each of the Rule's requirements.").

14  That is, in determining the propriety of a class action, the

15  question is not whether the plaintiff has stated a cause of action

16  or will prevail on the merits, but rather whether the requirements

17  of Rule 23 are met.  <u>Eisen v. Carlisle & Jacquelin</u>, 417 U.S. 156,

18  178 (1974).  The court must accept as true the substantive

19  allegations made in the complaint but need not "blindly rely on

20  conclusory allegations which parrot Rule 23 requirements [and] may

21  . . . consider the legal and factual issues presented by [a]

22  plaintiff's complaint." 2 Herbert Newberg & Alba Conte, Newberg on

23  Class Actions (3d ed.) § 7.26.

24     **B.  Discussion**

25       Plaintiff argues that his narrowed class definitions provide

26  an appropriate basis for class certification because any class

27  management issues are minimal with the narrowed claims.  In

28  opposing Plaintiff's Motion, GDIT emphasizes that, as a result of

43

the company's reorganization, GDIT's multiple-thousand California employees were subject to different payroll and financial systems during different times and that Sarviss has not submitted any evidence showing how those different systems utilized policies consistent with each other and consistent with the paychecks he received for a limited period of time in 2007.

1.    Relevant Statutory Backdrop and Allegations

Because certification depends both on the particular factual issues underlying a cause of action and on the nature of the cause of action itself, the Court briefly addresses the legal standards for the two relevant causes of action for which Plaintiff seeks class certification – the Second Claim for Relief and the Sixth Claim for Relief.

a.    Failure to Provide Accurate Itemized Wage Statements

Plaintiff's Second Claim for Relief alleges that GDIT "failed to furnish Plaintiff and the Class Members with timely, itemized statements showing legal name and address of the employer, the total hours worked by each of them, and other, relevant data such as the applicable hourly rates." Compl. ¶ 52. Plaintiff alleges that GDIT thereby violated California Labor Code § 226 and/or IWC Wage Order No. 4. Id. ¶ 51.

As relevant here, California Labor Code § 226 requires "[e]very employer" to "furnish each of his or her employees . . . an accurate itemized statement in writing showing . . . (8) the

1  name and address of the legal entity that is the employer[.]" Cal.

2  Labor Code § 226(a)(8).[24]

3          b.   Continuing Wages

4      Plaintiff's Sixth Claim for Relief alleges that GDIT "has

5  willfully failed to pay wages earned and unpaid promptly upon

6  termination or resignation," in violation of California Labor Code

7  §§ 201-202.  Compl. ¶¶ 69-70.

8      Section 201 of the California Labor Code provides that when an

9  employer discharges an employee, "the wages earned and unpaid at

10  the time of discharge are due and payable immediately."  Cal. Labor

11  Code § 201(a).  Section 202 of the California Labor Code provides

12  for when payment of wages is due after resignation for an employee

13  who does not have a written contract for a definite period.  Cal.

14  Labor Code § 202.

15          2.   Rule 23(a)

16      With those causes of action in mind, the Court turns to the

17  requirements of Federal Rule of Civil Procedure 23.  Rule 23(a)

18  contains four prerequisites to asserting a class action.  Pursuant

19  to Rule 23(a),

20          [o]ne or more members of a class may sue . . . as
            representative parties on behalf of all members only if:
21          (1) the class is so numerous that joinder of all members is
            impracticable;
22          (2) there are questions of law or fact common to the class;

23

24      [24]To the extent Plaintiff still seeks to certify the class
    with respect to Wage Order No. 4, the Court notes the following:
25  IWC Wage Order No. 4, codified at Cal. Code Regs. tit. 8, § 11040
    (hereinafter cited as 8 C.C.R. § 11040), provides that an employer
26  must furnish an employee with "an itemized statement in writing
    showing . . . (4) the name of the employer."  8 C.C.R.
27  § 11040(7)(B)(4).  Section 7 of Wage Order No. 4 does not apply to
    "persons employed in administrative, executive, or professional
28  capacities."  Id. § 11040(1)(A).

1          (3) the claims or defenses of the representative parties are
           typical of the claims or defenses of the class; and
2          (4) the representative parties will fairly and adequately
           protect the interests of the class.
3    Fed. R. Civ. P. 23(a).  GDIT does not dispute numerosity,[25] but

4    challenges whether Sarviss has met his burden to show the remaining

5    23(a) prerequisites.  The Court therefore addresses commonality,

6    typicality, and adequacy of representation, below.

7                    a.   *Commonality*

8          Rule 23(a)(2) requires that there be questions of law or fact

9    common to the class.  It "focuses on the relationship of common

10   facts and legal issues among class members," and "has been

11   construed permissively" such that "[t]he existence of shared legal

12   issues with divergent factual predicates is sufficient, as is a

13   common core of salient facts coupled with disparate legal remedies

14   within the class."  Dukes v. Wal-Mart, Inc., 509 F.3d 1168, 1177

15   (9th Cir. 2007) (quoting Hanlon v. Chrysler Corp., 150 F.3d 1011,

16   1019 (9th Cir. 1998)).  Because the test is "qualitative rather

17   than quantitative[,] one significant issue common to the class may

18   be sufficient to warrant certification."  Id.  "Where the party

19   opposing the class has engaged in some course of conduct that

20   affects a group of persons and gives rise to a cause of action, one

21   or more elements of that cause of action will be common to all of

22   the persons affected."  1 Newberg on Class Actions (4th ed.)

23   § 3:10.

24        In support of commonality, Plaintiff relies on his

25   declaration, his wage statement, and evidence submitted by

26

27        [25]The proposed class consists of over 2,500 employees.  See 1
     Newberg on Class Actions (4th ed.) § 3:5 (impracticability of
28   joinder for classes in the hundreds and above "obvious").

                                    46

Defendant that explains the progress of different pay systems at different stages of the company's corporate form. Plaintiff argues that Defendant's evidence shows that a "single entity now prepares all GDIT wage statements." Reply at 3. Plaintiff emphasizes that common legal questions include the nature of the damages and the statute of limitations. Additionally, Plaintiff reiterates his argument about troubles in getting class discovery.[26]

Defendant challenges Plaintiff's commonality showing. Defendant argues that Plaintiff's argument is conclusory, that Sarviss has not submitted any evidence to support commonality, and that GDIT has submitted evidence undermining the existence of common factual and legal issues. In particular, Defendant highlights that Plaintiff has not submitted evidence that reflects the pay stub received by any other class member.

With some hesitation, the Court finds Plaintiff's showing to be sufficient. Although the Court does not doubt that it makes *sense* for GDIT to have a common payroll system for California employees, Plaintiff's declaration and arguments standing alone would not be sufficient (as common factual issues) to support the certification of such a broad class in the face of Defendants' submissions showing that different employees were subject to different payroll systems because of the mergers and the existence of legacy employees. The threshold imposed by Rule 23(a), however, does not require that all or the majority of the issues be common to all class members. Because Sarviss has highlighted legal issues that are common, and in light of the lower threshold imposed by

---

[26]See pp. 39-40 & n.18, supra.

1   Rule 23(a), the Court finds that this showing is sufficient to

2   satisfy the commonality requirement.

3                    b.    *Typicality*

4        Plaintiff must also show that his claims are typical of the

5   class.  Typicality focuses on "the relationship of facts and issues

6   between the class and its representatives." Bishop v. Petro-Chem.

7   Trans., LLC, 582 F. Supp. 2d 1290, 1307 (E.D. Cal. 2008).  "Under

8   the rule's permissive standards, representative claims are

9   'typical' if they are reasonably coextensive with those of absent

10  class members; they need not be substantially identical." Hanlon,

11  150 F.3d at 1020; see also 1 Newberg on Class Actions (4th ed.)

12  § 3:15 ("Typicality refers to the nature of the claim or defense of

13  the class representative and not to the specific facts from which

14  it arose or the relief sought.  Factual differences will not render

15  a claim atypical *if the claim arises from the same event or*

16  *practice or course of conduct that gives rise to the claims of the*

17  *class members, and if it is based on the same legal theory*."

18  (emphasis added)).  For example, in Dukes, the Ninth Circuit found

19  that the representative's antidiscrimination claims were typical of

20  the class because, though the exact manifestation of the alleged

21  discrimination might be different, all of the class members were

22  allegedly victims of the same alleged violations – a discriminatory

23  policy.  See Dukes, 509 F.3d at 1184; Bishop, 582 F. Supp. 2d at

24  1308.  Where a representative's claims may be typical of *some* of

25  the proposed class members but *atypical* of other of the proposed

26  class members, courts have declined to certify.  See Bishop, 582 F.

27  Supp. 2d at 1308.

28

1    The Court is not convinced that Sarviss has made this
2  threshold showing for the large class he seeks to certify.  Sarviss
3  has argued that GDIT *currently* has a common payroll system that
4  makes his claims typical; however, he has presented no evidence
5  (even in his own declaration) showing that the payroll stub he
6  received or payroll system to which he was subject was consistent
7  with other class members' or consistent through the various
8  relevant time periods.  GDIT, on the other hand, has presented
9  evidence showing that, in fact, *different* payroll systems existed
10  for different employees during the relevant time period.  The Court
11  recognizes that Plaintiff's allegation is that all of the pay stubs
12  during the time period violated the same statute.  The Court also
13  recognizes that it is plausible that Plaintiff's claims are typical
14  of *some* other class members: GDIT's evidence suggests that
15  individuals in certain groups were treated to a common payroll
16  system.  See Breen Decl. ¶¶ 14-17.  In light of Plaintiff's broad
17  class definition, however, Plaintiff has not made a sufficient
18  showing of a common course of conduct by GDIT during the class
19  period or across employees.  As a result, Plaintiff's conclusory
20  allegations and arguments are not sufficient to satisfy the Court
21  that Plaintiff's claims about wage statements are in fact typical
22  of other class members'.  For example, Plaintiff's wage statement
23  allegations appear to rest on the disclosure of the employer name
24  and the itemization of hours.  Where different company names might
25  be involved, however, and/or a different means of generating pay
26  stubs, the proposed class appears too broad under the current
27  showing to satisfy the Court.
28

49

Put simply, Sarviss essentially seeks to rest on his allegations that there was a common course of conduct and that none of the payroll stubs during the class period used the appropriate name. If the parties had not engaged in class discovery for six months, the Court would be inclined to accept this allegation as true at this stage. That argument cannot be sufficient, however, where (1) Sarviss has had the opportunity to engage in significant discovery, (2) GDIT has presented evidence that different payroll systems existed at different times and for different employees, and (3) Sarviss has not suggested this is information that he was unable to acquire through discovery.[27] Again, Plaintiff's motion rests on his declaration (which only addresses his experience), the declaration of his counsel, and the declaration of a consultant as to damages calculations.[28] This showing is simply insufficient in light of Defendant's showing to convince the Court that Plaintiff's claims are typical of the broadly-framed class. The Court does not suggest, of course, that Plaintiff could not show, with more evidence, that his claims are typical of the broader class, that Plaintiff could not show his claims were typical of a narrower class, or that sub-classes with different class representatives were appropriate. On the particular certification request and

_____

[27]Again, while the Court understands Plaintiff's concern regarding discovery, the Court notes that Plaintiff had numerous avenues through which to enforce its entitlement to certain discovery or otherwise obtain information it would need to meet its burden.

[28]The declaration of Plaintiff's counsel provides a conclusory, self-serving statement about the predominance of certain issues purportedly based on his experience. See Harris Decl. ¶ 2. The consultant's declaration is similarly unhelpful with the typicality analysis.

1  briefing before the Court, however, the Court is hesitant to find

2  that Plaintiff has made a threshold showing that his claims are

3  typical of other members of the proposed Wage Statement Class *or* of

4  the Final Wage Subclass. That said, because the Rule 23(a)

5  requirements provide a relatively low threshold, the Court will

6  address the other Rule 23 requirements.

7                    c.   *Adequacy of Representation*

8       "The final hurdle interposed by Rule 23(a) is that 'the

9  representative parties will fairly and adequately protect the

10 interests of the class.'" Hanlon, 150 F.3d at 1020 (quoting Fed.

11 R. Civ. P. 23(a)(4)).  This requirement, which addresses due

12 process concerns, turns on the satisfaction of two questions: (1)

13 whether the named plaintiffs and their counsel have any conflicts

14 of interest with other class members and (2) whether the named

15 plaintiffs and their counsel will prosecute the action vigorously

16 on behalf of the class.  Id.  In light of the narrowed issues for

17 which Plaintiff seeks certification, perhaps two adequacy of

18 representation concerns exist: (1) Plaintiff potentially was under

19 a different scheme than other members of the class he seeks to

20 certify and (2) Plaintiff seeks to represent both past and current

21 employees, while he himself is a past employee.  The Court

22 nevertheless sees no conflict of interest in Plaintiff's

23 representation of all such employees, as the allegation is that

24 each type of payroll system violated California law, and the relief

25 Plaintiff seeks for such claims – damages – will be common to all

26 such individuals.  The latter inquiry "is directed to the vigor

27 with which the named representatives and their counsel will pursue

28 the common claims," and primarily considers the competency of

1    counsel.  <u>Id.</u> at 1021.  Court is satisfied that class counsel is

2    qualified and that counsel and Sarviss will pursue the action

3    vigorously.  Harris Decl. ¶ 2.  Overall, then, the Court is

4    satisfied that Plaintiff would be an adequate representative.

5              3.  <u>Rule 23(b)(3)</u>

6         Even if the Court were satisfied that Plaintiff had satisfied

7    Rule 23(a)'s prerequisites for class certification, the Court would

8    not be satisfied that Plaintiff has met its burden to show that

9    common questions predominate.  Pursuant to Federal Rule of Civil

10   Procedure 23(b)(3), a class action may be maintained if the

11   requirements of Rule 23(a) are satisfied and if:

12        the court finds that questions of law or fact common to class
         members predominate over any questions affecting only
13        individual members, and that a class action is superior to
         other available methods for fairly and efficiently
14        adjudicating the controversy.

15   Fed. R. Civ. P. 23(b)(3).  The Rule also provides a framework for

16   making that assessment.  In particular, it lists as "matters

17   pertinent to these findings":

18        (A) the class members' interests in individually controlling
         the prosecution or defense of separate actions;
19        (B) the extent and nature of any litigation concerning the
         controversy already begun by or against class members;
20        (C) the desirability or undesirability of concentrating the
         litigation of the claims in the particular forum; and
21        (D) the likely difficulties in managing a class action.

22   <u>Id.</u>

23        The Court is not convinced that the requirements of (b)(3) are

24   satisfied with respect to either the proposed Wage Statement Class

25   or the Final Wage Subclass.  With respect to certification of the

26   proposed Wage Statement Class for the purposes of Labor Code § 226,

27   the Court notes that the narrowed claims on which Plaintiff seeks

28   certification go far in streamlining the issues likely to be raised

1    for determination.  For similar reasons as discussed above in the

2    slightly different context of typicality, however, the Court is not

3    satisfied on this showing that certification of such a broad class

4    is appropriate.  Plaintiff's showing does not give a clear

5    indication, for example, of how many different types of pay stubs

6    the Court will need to address given the lengthy time period on

7    which Plaintiff seeks certification and the various payroll

8    policies that were apparently in place for different types of

9    California employees during that period.[29]  As mentioned above, the

10   Court does not suggest that Plaintiff would not be unable to

11   certify a narrower class – or this class on a different showing;

12   rather, the Court simply holds that, on the information before it,

13   it cannot certify the proposed class.

14        With respect to the proposed Final Wage Subclass, the Court's

15   concerns are perhaps even greater.  Where multiple hundreds of jobs

16   and contracts are potentially at issue, the Court is not satisfied

17   on Plaintiff's conclusory showing that common issues will

18   predominate over individual ones.  In particular, the Court sees as

19   potentially predominating individual issues the exact circumstances

20   of what was owed under an employee's particular contract and

21   whether or not certain kinds of payments are "owed" under different

22   contracts or under the law for different positions – issues that

23   bear on liability and damages under the relevant Labor Code

24

25
_____

26   [29]  To the extent Plaintiff still seeks certification on
     potential violations of IWC Wage Order No. 4, the Court notes that
27   it is even less convinced that common issues predominate.  As noted
     above, the relevant provisions of Wage Order No. 4 do not apply to
28   exempt employees, which would require a separate analysis of
     multiple hundreds of jobs.

sections.[30]  To the extent, for example, that Plaintiff claims the
wages due and unpaid to him are overtime wages, an individual
determination of whether there are in fact any wages owed might
rest on whether Plaintiff is an exempt employee.  Calling such
issues simply damages calculations, Plaintiff appears to suggest
that such issues are easily amenable to class treatment.  Although
the Court does not doubt that the existence of simple calculations
would not undermine certification, the Court views the potential
issues here (at least as Plaintiff has defined the class) as a
different matter: because of the broad range of employees, the
issues do not simply encompass calculation, but also entitlement.
Accordingly, the Court is not convinced that common issues
predominate.

   **C.   Conclusion**

   In light of the concerns discussed above, the Court finds that
Plaintiff has not met his burden to show that the requirements for
class certification are satisfied here.  The Court therefore will
not certify the class action on this showing.  Additionally, the
Court notes that it does not have sufficient information before it
to propose its own, narrower class.

**V.   CONCLUSION**

   For the foregoing reasons, the Court GRANTS IN PART AND DENIES
IN PART Defendant's Motion for Summary Judgment, DENIES Plaintiff's

---

[30]The description of Plaintiff's own contract provides an
example.  In this case, Plaintiff was paid a "completion bonus."
Although there was apparently no dispute between GDIT and Plaintiff
that he earned his completion bonus, to the extent such an issue is
disputed for a different employee who has resigned, an individual
contract interpretation could be required.

1   Motion for Certification of Collective Action, and DENIES

2   Plaintiff's Motion for Class Certification.

3   IT IS SO ORDERED.

4

5   Dated: July 14, 2009

6                                            DEAN D. PREGERSON
                                             United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28